# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Allegheny Reproductive Health Center, :
Allentown Women's Center, Delaware :
County Women's Center, Philadelphia :
Women's Center, Planned Parenthood :
Keystone, Planned Parenthood :
Southeastern Pennsylvania, and Planned :
Parenthood of Western Pennsylvania, :
                    Petitioners :
        :
           v. : No. 26 M.D. 2019
        :
Pennsylvania Department of Human :
Services, Teresa Miller, in her official :
capacity as Secretary of the :
Pennsylvania Department of Human :
Services, Leesa Allen, in her official :
capacity as Executive Deputy Secretary :
for the Pennsylvania Department of :
Human Service's Office of Medical :
Assistance Programs, and Sally Kozak, :
in her official capacity as Deputy :
Secretary for the Pennsylvania :
Department of Human Service's :
Office of Medical Assistance Programs, :
            Respondents : Argued: November 5, 2025


BEFORE: HONORABLE RENÉE COHN JUBELIRER, President Judge
             HONORABLE PATRICIA A. McCULLOUGH, Judge
             HONORABLE ANNE E. COVEY, Judge
             HONORABLE MICHAEL H. WOJCIK, Judge
             HONORABLE LORI A. DUMAS, Judge
             HONORABLE STACY WALLACE, Judge
             HONORABLE MATTHEW S. WOLF, Judge

This original jurisdiction matter returns to us on remand from the Pennsylvania Supreme Court. In *Allegheny Reproductive Health Center v. Pennsylvania Department of Human Services*, 309 A.3d 808 (Pa. 2024) (*Allegheny Reproductive II*), the Supreme Court determined that Petitioners, who are abortion care providers (Providers), have presented a constitutional challenge to Section 3215(c) and (j) of Pennsylvania's Abortion Control Act, 18 Pa.C.S. § 3215(c) & (j) (Coverage Exclusion), that is sufficient to survive preliminary objections. In so doing, the Supreme Court revisited its precedent regarding the Equal Rights Amendment[1] and equal protection provisions[2] of the Pennsylvania Constitution, reversed this Court's decision sustaining preliminary objections, and remanded for further scrutiny of the Coverage Exclusion. Now before the Court is Providers' application for summary relief. We conclude that the Coverage Exclusion violates the Equal Rights Amendment and the equal protection provisions of the Pennsylvania Constitution, beyond any genuine dispute of fact, and thus we grant Providers' application for summary relief.

## I. BACKGROUND

### A. Statute at Issue

The Coverage Exclusion, which Providers challenge, restricts abortion care that would otherwise be provided under Pennsylvania's Medical Assistance program, also known as Medicaid. "Medicaid is a joint federal-state program that provides medical assistance to the poor." *Allegheny Reproductive II*, 309 A.3d at

---

[1] PA. CONST. art. I, § 28.
[2] PA. CONST. art. I, §§ 1, 26 & art. III, § 32.

820 n.4. Our Supreme Court explained that the Medical Assistance program is

> a public insurance system providing eligible Pennsylvanians with medical insurance through either a fee-for-service or managed care health plan. Medical Assistance provides comprehensive medical care including inpatient hospital services, outpatient hospital services, physicians' services, clinic services at independent medical clinics and ambulatory surgical centers, and family planning services. It includes all pregnancy-related care, including prenatal care, obstetric, childbirth, neonatal and post-partum care. However, Medical Assistance does not cover all abortions.

*Id.* at 820-21 (footnote and citations omitted).

The Coverage Exclusion—Section 3215(c) and (j) of the Abortion Control Act—broadly prohibits Medicaid payments for abortion in Pennsylvania, allowing them only in very limited circumstances. Its full text is as follows:

> **§ 3215. Publicly owned facilities; public officials and public funds**
>
> * * *
>
> **(c) Public funds**.--No Commonwealth funds and no Federal funds which are appropriated by the Commonwealth shall be expended by any State or local government agency for the performance of abortion, except:
>
> > (1) When abortion is necessary to avert the death of the mother on certification by a physician. When such physician will perform the abortion or has a pecuniary or proprietary interest in the abortion there shall be a separate certification from a physician who has no such interest.
> >
> > (2) When abortion is performed in the case of pregnancy caused by rape which, prior to the performance of the abortion, has been reported, together with the identity of

3

the offender, if known, to a law enforcement agency having the requisite jurisdiction and has been personally reported by the victim.

(3) When abortion is performed in the case of pregnancy caused by incest which, prior to the performance of the abortion, has been personally reported by the victim to a law enforcement agency having the requisite jurisdiction, or, in the case of a minor, to the county child protective service agency and the other party to the incestuous act has been named in such report.

\* \* \*

**(j) Required statements**.--No Commonwealth agency shall make any payment from Federal or State funds appropriated by the Commonwealth for the performance of any abortion pursuant to subsection (c)(2) or (3) unless the Commonwealth agency first:

(1) receives from the physician or facility seeking payment a statement signed by the physician performing the abortion stating that, prior to performing the abortion, he obtained a non-notarized, signed statement from the pregnant woman stating that she was a victim of rape or incest, as the case may be, and that she reported the crime, including the identity of the offender, if known, to a law enforcement agency having the requisite jurisdiction or, in the case of incest where a pregnant minor is the victim, to the county child protective service agency and stating the name of the law enforcement agency or child protective service agency to which the report was made and the date such report was made;

(2) receives from the physician or facility seeking payment, the signed statement of the pregnant woman which is described in paragraph (1). The statement shall bear the notice that any false statements made therein are punishable by law and shall state that the pregnant woman is aware that false reports to law enforcement authorities are punishable by law; and

4

(3) verifies with the law enforcement agency or child protective service agency named in the statement of the pregnant woman whether a report of rape or incest was filed with the agency in accordance with the statement.

The Commonwealth agency shall report any evidence of false statements, of false reports to law enforcement authorities or of fraud in the procurement or attempted procurement of any payment from Federal or State funds appropriated by the Commonwealth pursuant to this section to the district attorney of appropriate jurisdiction and, where appropriate, to the Attorney General.

18 Pa.C.S. § 3215(c) & (j). The Pennsylvania Department of Human Services (DHS) has implemented the Coverage Exclusion with regulations. *See* 55 Pa. Code §§ 1141.57, 1163.62, 1221.57. Care providers are subject to federal criminal prosecution, fines, and imprisonment for seeking Medical Assistance reimbursement for abortion procedures. *Id.* § 1101.74.

## B. Petition for Review

Providers filed the original jurisdiction petition for review (Petition) naming DHS and other Commonwealth Respondents on January 16, 2019. The Petition alleges the following facts. Providers are a group of health centers, for-profit corporations, and nonprofit corporations that offer reproductive healthcare—including abortion—to women. Pet. ¶¶ 2-32. Medical Assistance generally covers the costs of all care they provide to women who choose to carry their pregnancies to term. *Id.* ¶ 48, 55. But the Coverage Exclusion forbids coverage for abortion unless the mother would otherwise die or the pregnancy results from rape or incest. *Id.* ¶ 54. There is no comparable exclusion of any health coverage—reproductive or otherwise—for men. *Id.* The medical costs of covering a pregnancy and childbirth far exceed the cost of an abortion. *Id.* ¶ 55.

5

Providers allege the Coverage Exclusion has caused women to carry pregnancies to term against their will. *Id.* ¶ 64. This harms both Providers and their patients. Women must choose whether to carry a pregnancy to term or to pay out of pocket for an abortion, diverting money they otherwise need for shelter, food, clothing, or childcare. *Id.* ¶ 59. These and other costs cause women to delay abortion care or forego it altogether. *Id.* ¶¶ 60-63. The maternal mortality risk of childbirth is 14 times greater than the mortality risk for abortion; women who cannot pay out of pocket are compelled to undergo the higher risks of childbirth. *Id.* ¶¶ 65, 67, 70. These risks are higher still for women with other health conditions. *Id.* ¶ 71.

The Coverage Exclusion has no exception for fetal abnormalities, no matter how severe. As a result, some women have suffered severe psychological harm knowing that the fetus they are carrying has a condition that will necessarily result in the child's death, but being unable to terminate the pregnancy because of the Coverage Exclusion. *Id.* ¶¶ 73-74.

Providers allege the Coverage Exclusion harms them as medical caregivers. They must dedicate money and staff time for ongoing maternal care for women who would choose to have an abortion but for the Coverage Exclusion. *Id.* ¶¶84. Providers regularly subsidize non-covered abortions—out of their own pockets, and with their own time by seeking charitable funding—to try to minimize the harms to women described above. *Id.* ¶¶ 85-86. The Coverage Exclusion interferes with Providers' counseling of their patients, requiring them to discuss sensitive and personal matters—such as whether the sex that led to the pregnancy was rape or incest—that have no medical purpose. *Id.* ¶ 87.

The Petition seeks relief in two Counts. Count I challenges the Coverage Exclusion as unconstitutional under Article I, Section 28 of the

6

Pennsylvania Constitution, known as Pennsylvania's Equal Rights Amendment.[3] Providers claim the Coverage Exclusion applies only to women, limiting healthcare only for women and not for men, and thus denies women essential healthcare services "solely on the basis of their sex." Pet. ¶ 90.

Count II challenges the Coverage Exclusion as unconstitutional under the equal protection provisions of the Pennsylvania Constitution.[4] Pet. ¶ 94.

---

[3] The Equal Rights Amendment states:

> Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual.

PA. CONST. art. I, § 28.

[4] The equal protection provisions, sometimes also known as the "equality provisions," of the Pennsylvania Constitution, *Allegheny Reproductive II*, 309 A.3d at 917, state as follows:

> All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

PA. CONST. art. I, § 1.

> Neither the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right.

PA. CONST. art. I, § 26.

> The General Assembly shall pass no local or special law in any case which has been or can be provided for by general law and specifically the General Assembly shall not pass any local or special law:
>
> > 1. Regulating the affairs of counties, cities, townships, wards, boroughs or school districts:
> > 2. Vacating roads, town plats, streets or alleys:
> > 3. Locating or changing county seats, erecting new counties or changing county lines:

**(Footnote continued on next page…)**

7

Providers claim the Coverage Exclusion discriminates against women by limiting their freedom to choose to terminate a pregnancy. Relatedly, Providers characterize the right to reproductive autonomy—including the right to choose to terminate a pregnancy—as a fundamental right and seek a declaration to that effect. *Id.* ¶¶ 95-96 & Wherefore Clause. They claim the Coverage Exclusion unlawfully discriminates against women for attempting to exercise a fundamental constitutional right. *Id.* ¶ 96.

On both theories of relief, Providers seek a declaration that the Coverage Exclusion violates the relevant provisions of the Pennsylvania Constitution, and a permanent injunction against enforcement of the Coverage Exclusion and its enabling regulations.

### C. Procedural History and *Allegheny Reproductive II*

DHS initially opposed the relief sought in the Petition and filed preliminary objections based on lack of standing and demurrer. While those preliminary objections were pending in this Court, certain members of the Pennsylvania General Assembly sought to intervene to defend the Coverage

---

4. Erecting new townships or boroughs, changing township lines, borough limits or school districts:

5. Remitting fines, penalties and forfeitures, or refunding moneys legally paid into the treasury:

6. Exempting property from taxation:

7. Regulating labor, trade, mining or manufacturing:

8. Creating corporations, or amending, renewing or extending the charters thereof:

Nor shall the General Assembly indirectly enact any special or local law by the partial repeal of a general law; but laws repealing local or special acts may be passed.

PA. CONST. art. III, § 32.

8

Exclusion as constitutional. A panel of this Court granted the legislators intervention. *See Allegheny Reprod. Health Ctr. v. Pa. Dep't of Hum. Servs.*, 225 A.3d 902, 914 (Pa. Cmwlth. 2020), *rev'd*, 309 A.3d 808 (Pa. 2024).

Thereafter, this Court sustained the preliminary objections on both standing and demurrer grounds. *See Allegheny Reprod. Health Ctr. v. Pa. Dep't of Hum. Servs.*, 249 A.3d 598, 611 (Pa. Cmwlth. 2021) (en banc) (*Allegheny Reproductive I*), *rev'd*, 309 A.3d 808 (Pa. 2024). As to standing, we concluded that Providers met neither the third-party standing test nor the traditional test for standing based on financial harm to Providers under a "zone of interests" analysis. *Id.* at 607. We sustained the demurrer raised by DHS and the legislators based on *Fischer v. Department of Public Welfare*, 502 A.2d 114 (Pa. 1985), *overruled by Allegheny Reproductive II*, 309 A.3d 808 (Pa. 2024). We concluded that all of the claims in the instant Petition had already been raised and rejected in *Fischer*, so Providers failed to state a claim by making those same claims here. *Allegheny Reproductive I*, 249 A.3d at 611.

In *Allegheny Reproductive II*, our Supreme Court overruled its own decision in *Fischer*, vacated our decision in *Allegheny Reproductive I*, reversed our earlier decision granting legislators intervention, and remanded with instructions.[5]

---

[5] Justice Donohue authored the opinion of the Court. Justice Wecht joined that opinion in full and authored a concurring opinion. Justice Dougherty authored a concurring and dissenting opinion noting he substantially joined the principal opinion and its mandate, but dissented from Sections III.E and III.F.3.b—regarding the right to reproductive autonomy and reliance on that right in the equal protection analysis. *Allegheny Reproductive II*, 309 A.3d at 997-98 (Dougherty, J., concurring and dissenting). Justice Dougherty would have allowed this Court to address those claims in the first instance on remand rather than resolve them. *Id.* Because the matter was heard by six Justices, the parts of the opinion joined by three Justices constitute the majority opinion that is binding on this Court. Chief Justice Todd authored a concurring and dissenting opinion, joining in the procedural aspects of the majority opinion—standing and intervention—but dissenting from the mandate and the court's overruling of *Fischer*. *Id.* at 988-89 (Todd, C.J., concurring and **(Footnote continued on next page…)**

9

As to the procedural issues, the Supreme Court first concluded that Providers have standing to pursue their claims and reversed our determination to the contrary. In so holding, it clarified that no "zone of interests" analysis was necessary because Providers are immediately harmed by the fact that the Coverage Exclusion prohibits them from billing for procedures they provide to Medical Assistance-covered patients. 309 A.3d at 839. Second, the court concluded that the legislator intervenors' interest in the Coverage Exclusion is too attenuated to justify intervention, and it reversed our decision granting intervention. *Id.* at 846-49.

On the merits, the *Allegheny Reproductive II* Court overruled *Fischer* on both the Equal Rights Amendment and equal protection issues. The Supreme Court initially recognized *Fischer*'s status as binding precedent, which the doctrine of stare decisis ordinarily protects. *Id.* at 850. But the Court noted the doctrine is not absolute and allows overruling earlier constitutional interpretations if under "any rules of constitutional construction recognized at the time of those decisions or now, the interpretation is patently flawed." *Id.* at 883 (quoting *McLinko v. Dep't of State*, 279 A.3d 539, 572 (Pa. 2022)).

*Fischer* involved a group of providers and patients challenging the Coverage Exclusion based on the same Pennsylvania constitutional provisions as in this case. The *Fischer* Court had rejected both challenges and upheld the statute. For equal protection, it applied rational basis review or, alternatively, intermediate scrutiny, finding an "important governmental interest" in the preservation of potential life. *Allegheny Reproductive II*, 309 A.3d at 856 (discussing *Fischer*). The *Fischer* Court also applied a "penalty analysis" common under the United States

_____

dissenting). Justice Mundy authored a concurring and dissenting opinion explaining she would not have overruled *Fischer*. *Id.* at 998-99 (Mundy, J., concurring and dissenting). Justice Brobson recused.

10

Constitution, concluding that the Coverage Exclusion does not violate equal protection because it does not punish any person for the exercise of a protected right. *Id.* at 858-59. And it recognized an "exception" to the Equal Rights Amendment when sex-based discrimination is founded on "physical characteristics unique to only one sex." *Id.* at 860. Our Supreme Court reexamined both issues in *Allegheny Reproductive II*.

The Court first addressed the Equal Rights Amendment. It noted that the *Fischer* court had "concluded that the [Coverage Exclusion] did not implicate the Equal Rights Amendment, [so] it declined to conduct any Equal Rights Amendment analysis." *Allegheny Reproductive II*, 309 A.3d at 867. The Court began with an *Edmunds*[6] analysis of the Equal Rights Amendment. It found the text of the Amendment unambiguous. *Id.* at 868-69. It reviewed the history of legal sex discrimination that led to the adoption of the Amendment and noted several Pennsylvania decisions that had struck down sex-based statutory distinctions after the Amendment was adopted. These included statutes that allowed payment of alimony pendente lite to wives but not to husbands; imposed minimum prison sentences on men but not on women; required a mother's consent to adoption of her child but not the father's consent; and presumed that fathers, not mothers, would be financially responsible for child support in a divorce. *Id.* at 874-75 (collecting cases). The Court noted *Cerra v. East Stroudsburg Area School District*, 299 A.2d 277 (Pa. 1973), where it had interpreted a statutory prohibition on sex discrimination

---

[6] In *Commonwealth v. Edmunds*, 586 A.2d 887 (Pa. 1991), the Supreme Court established a test for deciding whether a Pennsylvania constitutional provision provides more, less, or the same protection as a similar federal constitutional provision. The factors are: "(1) the text of the Pennsylvania constitutional provision; (2) the history of the provision, including Pennsylvania case-law; (3) related case-law from other states; [and] (4) policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence." *Id.* at 895.

11

to prohibit the school district's termination of a teacher's employment because of her pregnancy. *Allegheny Reproductive II*, 309 A.3d at 876 (citing *Cerra*). It reasoned that the *Fischer* Court had improperly distinguished *Cerra* as being based on the concept that pregnancy is a "disability," rather than prohibited sex discrimination, and it clarified that "*Cerra* conclusively established that such differentiation is 'sex discrimination pure and simple.'" *Id.* (quoting *Cerra*, 299 A.2d at 280). The Court next reviewed the decisions of other state courts, which "have concluded that the phrases 'on account of sex' and 'because of sex' encompass reproductive capabilities as well as stereotypical gender norms when applying their equal rights amendments to comparable Medicaid coverage exclusions. *Id.* at 878. Finally, the *Allegheny Reproductive II* Court addressed the quality of *Fischer*'s reasoning and concluded:

> We recognize that our Equal Rights Amendment jurisprudence prior to *Fischer* did not address a law that distinguished between the sexes based on a physical characteristic unique to one sex. However, based upon the unambiguous text of the Equal Rights Amendment, there is no room for a carve out for laws that differentiate between the sexes for any reason. The *Fischer* Court contorted a simple, longstanding principle of Section 28 law by declaring that the basis for the Coverage Exclusion was not a distinction based on sex but abortion . . . .
>
> . . . .
>
> *Fischer*'s analytical device that transposes the recognition of the legislative policy for a statute with the recognition of Section 28's constitutional protection guts the guarantee of the Equal Rights Amendment. The analytical device—by accepting legislative policy pronouncements in place of conducting any judicial scrutiny of sex-based classifications—avoids the difficult questions. While there may be a legitimate state interest in this Commonwealth for promoting potential life, the

12

question remains whether that legislative determination trumps the constitutional guarantee expressed in the Equal Rights Amendment that individuals are to be treated equally under the law and that rights cannot be denied or abridged based on sex. It is for the courts, not the Legislature, to conduct a searching inquiry to determine whether the balance struck by the Legislature runs afoul of the constitutional promise that rights will not be denied or abridged based on sex.

Finally, and most fundamentally, the *Fischer* Court's adoption of an exception to the Equal Rights Amendment for "physical conditions unique to one sex" is so contrary to the text of the Equal Rights Amendment that contains no exceptions that it constitutes a special justification for overruling that analysis. Consequently, we will not perpetuate its error by considering the flawed framework when addressing Providers' claim.

. . . .

Based on the foregoing interpretation of the Equal Rights Amendment, we overrule *Fischer*'s interpretation of the Equal Rights Amendment. We further conclude that when a statute is challenged as violative of Section 28, a sex-based distinction is presumptively unconstitutional, and it is the government's burden to rebut the presumption with evidence of a compelling state interest in creating the classification and that no less intrusive methods are available to support the expressed policy.

*Allegheny Reproductive II*, 309 A.3d at 885-91 (footnote and some citations omitted). Under this standard, "a sex-based distinction is presumptively unconstitutional," and "[i]t is the government's burden to rebut the presumption with evidence of a compelling state interest in creating the classification and that no less intrusive methods are available to support the expressed policy." *Id.* at 891. "The judicial inquiry will be searching, and no deference will be given to legislative policy reasons for creating sex-based classifications. Given these parameters, we

13

acknowledge that few, if any, sex-based conferrals of benefits or burdens will be sustainable." *Id.*

The Court addressed Providers' other constitutional claim in two parts. First, in a part of the Court's opinion joined by only a plurality of the Justices,[7] the Court determined that the Pennsylvania Constitution guarantees a fundamental right to reproductive autonomy. *Id.* at 917. In an *Edmunds* analysis, the Court explained that the Pennsylvania Constitution's unique Declaration of Rights (i.e., Article I of the Pennsylvania Constitution) protects fundamental, inherent rights—not rights created or granted by the government as a matter of grace. *Id.* at 897. It noted the long-recognized right to privacy found in Article I, Sections 1 and 8 of the Pennsylvania Constitution,[8] which relies on and includes the inherent "right to be let alone." *Id.* at 896-901. The Court opined that the real issue in this case is not the abortion procedure itself, but the "monumental impact on a woman making the decision to carry a pregnancy to birth or not," and concluded that "if the Article I rights that this Court has recognized do not encompass this decision, it is hard to imagine a decision that would be encompassed." *Id.* at 909. The Court noted that in other states whose constitutions provide for inherent rights, courts have recognized a right to reproductive choice. *Id.* at 912-16. The Court characterized this right, like other privacy rights protected by the Declaration of Rights, as

---

[7] *See supra* n.5; *see also Allegheny Reproductive II*, 309 A.3d at 892 n.84 (noting this portion of the opinion is a plurality only).

[8] The latter provides:

The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

PA. CONST. art. I, § 8.

14

fundamental. *Id.* at 903, 917.

Lastly, the Court turned to equal protection. It first noted that the *Fischer* Court had treated the Pennsylvania Constitution as containing essentially the same level of equal protection guarantee as the federal Constitution, which has been a common approach in Pennsylvania jurisprudence, including the federal "penalty analysis." *Id.* at 918. The Court ultimately concluded *Fischer* had erred in doing this. *Id.* at 918, 934. In another *Edmunds* analysis, the Court noted that the text of Pennsylvania's equal protection provisions "is notably different from the standalone federal Equal Protection Clause.[9]" The Court reviewed its equal protection decisions, stating that although it will continue to apply federal equal protection *principles* when analyzing the Pennsylvania Constitution, such as means-ends analysis, this does not mean that the *level* of protection or *interpretations* of the two constitutions are in lockstep, as the *Fischer* Court had presumed. *Id.* at 933-34. The Court observed that several other states have interpreted their own constitutions to provide greater equal protection guarantees than the federal Constitution, leading some to conclude their constitutions protect abortion. *Id.* at 934-38. The Court then noted that *Fischer* had not treated Section 26 as appropriately distinctive, had skipped over the critical equal protection step of defining the level of scrutiny that applies, and had incompletely applied federal equal protection law to what should be a distinct state-law right, distinctly analyzed. *Id.* at 942-43. Finally, the Court noted: "[T]he foundation on which *Fischer*'s equal protection analyses were built has been overruled. That is, with *Roe*[ *v. Wade*, 410 U.S. 113 (1973),] overruled [by *Dobbs v. Jackson Women's Health Organization,* 597 U.S. 215 (2022)], the case law in [*Roe*'s] wake, including the primary cases *Fischer* cited in order to justify its

---

[9] U.S. Const. amend. XIV.

15

penalty analysis, is also disrupted . . . . Therefore, following *Dobbs*, it is logical and necessary for this Court to reconsider the premise of *Fischer* and address the unique state constitutional questions that are otherwise unanswered." *Allegheny Reproductive II*, 309 A.3d at 943. Having overruled *Fischer* on this issue, the Court concluded:

> With the benefit of an *Edmunds* analysis, it becomes clear that Section 26 of our Charter affords broader protections than the federal Equal Protection Clause . . . . Thus, when a court is presented with a legislative classification that touches on the exercise of a civil right and it is being challenged on the basis that it is discriminatory, the court shall determine whether the classification operates neutrally with regard to the exercise of that right. If it does not, the court shall then conduct a commensurate means-end review.
>
> . . . .
>
> Section 26 prohibits not only the denial to any person the enjoyment of any civil right, but it explicitly prohibits the discrimination against any person in the exercise of any civil right . . . . Thus, the government must maintain a position of neutrality with regard to citizens' exercise of their constitutional rights. It may only depart from this neutrality when there is a justification to sustain a legislative classification.

*Id.* at 945. The Court then commented on the commensurate means-ends review.[10] Starting from its earlier conclusion—that the Coverage Exclusion burdens the fundamental right to reproductive autonomy—the plurality determined that strict scrutiny should apply to the Coverage Exclusion, such that it would survive only if the government can show that it is "necessary to the achievement of a compelling

---

[10] Only a plurality of the Justices joined in the means-ends analysis in Section III.F.3.b of the opinion. *See supra* n.5 & *Allegheny Reproductive II*, 309 A.3d at 945 n.176.

16

state interest." *Id.* at 946 (quoting *Commonwealth v. Bell*, 516 A.2d 1172, 1178 (Pa. 1986)).

The Court concluded with its mandate[11] to this Court, which reads in its entirety:

> In this appeal by Providers from the orders of the Commonwealth Court, we rule as follows:
>
> 1. On the issues raised in preliminary objections, we decide that it was error to conclude that Providers lacked standing to assert the Pennsylvania constitutional claims raised in the [Petition].
>
> 2. We conclude that the lower court erred in granting the petitions to intervene filed by certain individual Pennsylvania Senators and Legislators.
>
> 3. Further, on the Commonwealth Court's apparent alternative grounds for dismissing the [Petition] by the grant of a preliminary objection demurring to the claims raised in the [P]etition based upon this Court's prior decision in [*Fischer*], we reverse.
>
> 4. We overrule *Fischer*'s interpretation of Article I, Section 28, and we hold that when a statute, such as the Coverage Exclusion, is challenged as violative of Section 28, a sex-based distinction is presumptively unconstitutional, and it is the government's burden to rebut the presumption with evidence of a compelling state interest in creating the classification and that no less intrusive methods are available to support the expressed policy.
>
> 5. We overrule *Fischer*'s interpretation of Article I, Section 26, and we hold that a court, presented with a challenge to a legislative classification that touches on the exercise of a civil right on the basis that it violates Article I, Section 26, must determine whether

---

[11] A majority of the Justices joined the Court's mandate.

the classification operates neutrally with regard to the exercise of that right. If it does not, the court shall then conduct a commensurate means-end review.

This appeal does not resolve the ultimate issues challenging the constitutionality of the Coverage Exclusion under the Pennsylvania Constitution. In response to the issues raised in the appeal, we reverse the January 28, 2020 order of the Commonwealth Court granting intervention, and we reverse the March 26, 2021 order of the Commonwealth Court sustaining the preliminary objections of DHS and dismissing the [Petition]. We remand to the Commonwealth Court for further proceedings consistent with the mandate contained in Part IV of this opinion.

*Allegheny Reproductive II*, 309 A.3d at 947.

After the Supreme Court's decision and remand in *Allegheny Reproductive II*, DHS notified this Court that it would no longer defend the constitutionality of the Coverage Exclusion. This left no party adverse to Providers' position. Providers filed their application for summary relief, and they and Respondents filed briefs supporting the application. The parties stipulated to essentially all of the facts alleged in the Petition, including specifically the following fact: "There is no comparable [Medical Assistance] coverage ban for men's reproductive health care. There is no medical condition that only men experience for which [Medical Assistance] denies coverage." Joint Statement of Undisputed Facts (Joint Statement) ¶ 27; *accord id.* ¶ 67. Following oral argument before this Court in February 2025, the Pennsylvania Attorney General sought leave to intervene in this matter to defend the constitutionality of the Coverage Exclusion under Section 204(a)(3) & (c) of the Commonwealth Attorneys Act.[12] This Court granted

---

[12] Act of October 15, 1980, P.L. 950, 71 P.S. § 732-204(a)(3) & (c) (authorizing Attorney General to intervene).

18

intervention, the Attorney General[13] filed a brief opposing Providers' application for summary relief, and the Court heard supplemental oral argument.

## II. ISSUES AND STANDARD FOR SUMMARY RELIEF

We grant summary relief only if the applicant's right to relief is clear and there are no genuine issues of material fact. *Phantom Fireworks Showrooms, LLC v. Wolf*, 198 A.3d 1205, 1220 (Pa. Cmwlth. 2018) (en banc). A genuine dispute of fact precludes summary relief. *Id.* "We review the record in the light most favorable to the opposing party and resolve all doubts concerning the existence of a genuine issue of material fact in favor of that party." *Id.* "A material fact is one that directly affects the outcome of the case." *Dep't of Env't Prot. v. Delta Chems., Inc.*, 721 A.2d 411, 416 (Pa. Cmwlth. 1998) (en banc).

Providers' application for summary relief seeks judgment in their favor as a matter of law on both counts of the Petition, relying on the analytical frameworks established in *Allegheny Reproductive II*. Accordingly, the application and the parties' arguments address two broad issues. First, Providers ask us to declare the Coverage Exclusion unconstitutional under the Equal Rights Amendment. Second, they ask us to declare the Coverage Exclusion unconstitutional under the equal protection provisions. Entailed within that second issue, Providers ask us to declare that reproductive autonomy is a fundamental right under the Pennsylvania Constitution, and thus to apply strict scrutiny. But they argue alternatively that even if only rational basis review applies, they are entitled to summary relief because the Coverage Exclusion fails that means-ends test also. Consistent with its notice to this Court, DHS concurs in the relief sought.

---

[13] For clarity, we refer to these arguments as the Attorney General's, though they are really made on behalf of the entire Commonwealth. *See* Section 204(c) of the Commonwealth Attorneys Act, 71 P.S. § 732-204(c).

19

The Attorney General opposes all of the summary relief sought and asks us to allow the case to go to trial, maintaining there are genuine issues of fact.

## III. DISCUSSION

### A. The Equal Rights Amendment

#### 1. Parties' Arguments

Providers argue the Coverage Exclusion cannot meet the stringent *Allegheny Reproductive II* test under any factual circumstances. They highlight that the Medical Assistance program covers all medical care for pregnant patients who continue a pregnancy—including prenatal care and childbirth—but withholds coverage when a patient seeks an abortion. This disparity, they argue, both reflects and reinforces unequal gender stereotypes of women as a class and obstructs their ability to participate fully in social, educational, civic, and economic life. They stress the disproportionate impact the exclusion has on women of color, who are more likely to rely on Medical Assistance. They dispute that any interest, let alone a compelling one with narrow tailoring, is present to justify this. They note that most other jurisdictions considering this issue have held that excluding abortion coverage from Medicaid violates their respective equal rights amendments. *See* Providers' Br. at 29-30 (collecting cases).

The Attorney General accepts the Supreme Court's holding that the Coverage Exclusion is a sex-based classification. He proffers three state interests that, he argues, are compelling, and for which the Coverage Exclusion is the least intrusive means of pursuit.

First, the Attorney General asserts a state interest in protecting fetal life. He cites the sovereign's inherent right and duty to protect life, liberty, and property. He notes the legislature's statement of its purpose "to protect the life and health of

20

the child subject to abortion," 18 Pa.C.S. § 3202(a), and argues this statute recognizes a compelling state interest. Further, the Attorney General maintains this allegedly compelling interest applies for the entire duration of a pregnancy, and not only after some demarcated point of "viability." *See* Attorney General's Br. at 17-18. The Attorney General then argues the Coverage Exclusion is one mechanism through which the legislature is pursuing the state interest in preserving fetal life and asks us to defer to that legislative choice. He disputes other means, like contraception, as a route to that interest, claiming the interest at stake is narrowly in "protecting life already in being," and that this is distinct from preventing unwanted pregnancy, which is not, he claims, in the Commonwealth's interest. *Id.* at 23. With the interest so narrowed—i.e., an interest that cares only about ensuring pregnancies are carried to term—he argues the Coverage Exclusion is the least restrictive means for pursuing that interest. He frames the interest as "not funding the termination of a fetus," *id.* at 15, and argues that the Coverage Exclusion is aimed directly at that interest because if the government subsidizes abortion, there will be more abortion, *id.* at 24.

Second, the Attorney General asserts a state interest in protecting the health of women. In his view, this includes a duty to protect women—who may voluntarily give their informed consent to abortion—from alleged psychological harm caused by their own medical choices. He requests the opportunity to prove at trial that abortion has harmed at least some women, and that some women later regret their choice of abortion. *Id.* at 19-20. He again frames any disagreement with this view as a policy dispute for which we should defer to the legislature. As to means, the Attorney General does not directly explain why the Coverage Exclusion narrowly promotes this alleged interest, except by saying that less funding for

21

abortions will mean fewer abortions. He claims that the interest in protecting women from abortion does not amount to coerced childbirth because it is only a matter of funding, and women are still free to subsidize their own abortions if that is what they choose.

Third, the Attorney General asserts a state interest in "not violating the conscience of those who object to abortion." *Id.* at 20. He grounds this on the general right of conscience, and on the legislature's stated policy in the statute to "respect and protect the right of conscience of all persons who refuse to . . . subsidize . . . abortions." *Id.* at 21 (quoting 18 Pa.C.S. § 3202(d)). He once again asks us to defer to the legislature's weighing of any countervailing conscience rights. The Attorney General does not directly address how the Coverage Exclusion is tailored to this conscience right for purposes of the Equal Rights Amendment.

Providers reply that the policy-driven rationales the Attorney General gives are geared toward satisfying rational basis review, which is not the standard under the Equal Rights Amendment. They dispute that any of those interests are sufficiently compelling to rebut the presumed unconstitutionality. Providers point out that the Attorney General's proposal of deference to legislative policy judgments has already been rejected by the Supreme Court in *Allegheny Reproductive II*. They also note that for each of the three asserted interests, the question is not whether that interest is compelling in the abstract; it is whether that interest justifies a *funding disparity* under the Coverage Exclusion. And the interest asserted must be so compelling as to justify the coercion of at least some women's carrying a pregnancy to term. Providers argue the Attorney General has simply not done enough to show that the abstract interests he advances are sufficiently compelling to support a sex-based classification.

Providers separately argue that, even if one or more of the asserted interests is sufficiently compelling, the Coverage Exclusion is not the least intrusive means of pursuing it. First, they argue the interest in fetal life can be pursued through a host of other, less intrusive means—funding for family planning and contraception, which are relevant to pregnancies that may occur, and funding for pregnancy counseling, maternal healthcare, and post-delivery care for the child and mother, which will encourage women to carry pregnancies to term. Second, regarding the interest in women's health, they dispute that the Coverage Exclusion has any single effect on that interest. Rather, they argue, failing to fund abortion for women who rely on Medical Assistance will result in some of those women choosing to carry a pregnancy to term when they otherwise would not, which will profoundly harm the health—physical and psychological—of some of those women. Third, regarding the interest in the conscience rights of those who oppose abortion, Providers point out that satisfying all the conscience-based policy preferences of citizens may well be impossible, and that regardless, the state could use less intrusive means to protect this interest, such as a tax credit or tax choice program. In sum, Providers maintain that "the Commonwealth—whether through Respondents or [the Attorney General]—has not met its burden to show that the Coverage Exclusion accomplishes any compelling state interest in this context, much less that it is the least restrictive means to do so." Providers' Second Reply Br. (filed May 28, 2025) at 17.

## 2. Analysis

On this particular challenge to the Coverage Exclusion, we do not begin—as we usually would—with a presumption of constitutionality. Rather, "a sex-based distinction is presumptively unconstitutional, and it is the government's burden to rebut the presumption with evidence of a compelling state interest in

23

creating the classification and that no less intrusive methods are available to support the expressed policy." *Allegheny Reproductive II*, 309 A.3d at 947. "[T]he Coverage Exclusion is inherently sex-based." *Id.* at 886; *accord id.* at 891. "[F]ew, if any, sex-based conferrals of benefits or burdens will be sustainable." *Id.* at 891.

This is a constitutional case. We evaluate whether the asserted interest is compelling within the specific context of the Equal Rights Amendment and the Coverage Exclusion. *Id.* at 887. We do not simply defer to current legislative policy judgments, as we must in a case involving only statutory interpretation. *See id.* That would be circular reasoning and an abdication of our judicial responsibility to examine whether the legislature has strayed outside the confines of the Pennsylvania Constitution, which binds the legislature as well. *See id.* "[T]he traditional function of judicial review" in a constitutional case is independent constitutional interpretation by the judicial branch. *Id.* at 847.

Initially, we are not persuaded that the state interests the Attorney General has identified are compelling within the Equal Rights Amendment analysis. First, regarding fetal life, the Attorney General has narrowly defined this as an interest in preserving already-existing fetuses. He has disclaimed any interest in promoting human reproduction in general, or in preventing unplanned pregnancy. In this way, the Attorney General appears to have embraced the necessary implication of this view: the interest "can be understood only as an interest that is advanced at the cost of forcing women to bear children against their will. It will be DHS's unenviable burden on remand to establish that a state interest that is advanced through the coercive use of women's bodies is constitutionally compelling . . . ." *Allegheny Reproductive II*, 309 A.3d at 955 (Wecht, J., concurring). The Attorney General simply has not explained why *that interest* is compelling for the state. He

24

has not shown or argued why, as a matter of law, the state must ensure that every pregnancy is carried to term. The Attorney General has not met this burden on remand, and Respondents have stated they cannot meet it.

Second, regarding women's psychological well-being, the Attorney General has not identified any other context in which we have found a *compelling* state interest in protecting a competent adult from feeling regret for her free choices. There may be such laws where a general state interest favors paternalism—think of seat belt legislation—but in this case, the interest must be compelling. To borrow a turn of phrase from a different context: although the state may have a compelling interest in "safeguarding the physical and psychological well-being *of a minor*" who is victimized and cannot truly give consent, we are not persuaded there is any compelling "paternalistic interest in regulating [*an adult's*] mind," such as that of a woman who chooses with informed consent to procure an abortion as medical care. *Contra Osborne v. Ohio*, 495 U.S. 103, 109 (1990) (emphasis added) (quoting, in part, *New York v. Ferber*, 458 U.S. 747, 757 (1982)).

Third, regarding citizens' conscience interests in state funding for abortion, we are not persuaded by the Attorney General's argument. Just because the legislature *has in fact* expressed a policy preference for favoring one group's conscience rights over another's, that does not mean it has a *compelling* interest in doing so. This argument, like with the other interests the Attorney General asserts, relies principally on deference to extant legislative determinations, and fails to explain why this or the other interests rise to a compelling level in this context. We conclude that, though these three interests may be permissible state interests in the abstract, at least to some degree, the Attorney General has not shown that they are compelling.

Finally, even if we were to find one or more of those interests compelling, we agree with Providers that the Attorney General cannot demonstrate the Coverage Exclusion is the least intrusive means of pursuing them. Any state interest in promoting carrying a pregnancy to term is furthered at least as well by state investment in maternal and infant healthcare, and in childcare and other resources for new mothers, as it is by the Coverage Exclusion. Providers persuasively identify some such programs that exist now—federal block grant programs, state health policy, and the Women, Infants, and Children (WIC) program—and one can imagine others that may yet be created, such as subsidized childcare that defrays the enormous expenses of delivering and raising a child. Those means are less intrusive than coercing women who cannot afford to pay for their own abortion into carrying a pregnancy to term. The same is true for the alleged interest in women's health. If the state believes certain medical procedures may psychologically harm women, the state can license, regulate, and educate around such care. That is less intrusive than taking an entire medical procedure off the table categorically for some women, some of whom may benefit from that procedure—a fact the Attorney General does not dispute. Finally, to the extent the legislature has any legitimate interest in favoring one policy or conscience view over another regarding abortion, the legislature has less intrusive means to favor that interest, such as a tax choice or tax credit program. In sum, the Attorney General has not shown there is any genuine dispute about whether the Coverage Exclusion is the least intrusive means of pursuing these interests. We do not need to hear evidence about whether abortion has had negative consequences for some women to know that the Coverage Exclusion is not the proper means for the state to address that issue.[14]

[14] The lead Dissent says "the Commonwealth has the right to rebut the presumption of
**(Footnote continued on next page…)**

26

unconstitutionality with evidence at a hearing." *Allegheny Reprod. Health Ctr. v. Pa. Dep't of Hum. Servs.*, ___ A.3d ___ (Pa. Cmwlth., No. 26 M.D. 2019, filed Apr. 20, 2026) (*Allegheny Reproductive III*) (McCullough, J., dissenting), slip op. at 13; *see also id.* (Wallace, J., dissenting), slip op. at 4-7 (arguing material facts remain in dispute).  We customarily refer to taking evidence on the merits in our original jurisdiction as a "trial," which would include discovery.  That robust proceeding, which is sometimes years long—not a mere hearing—is what the Attorney General asks for.  Attorney General's Br. at 19, 51, 65.  Of course, the Supreme Court was aware of our trial practice when it stated that the Commonwealth bears the burden to rebut the presumption of unconstitutionality "with evidence of a compelling state interest."  *Allegheny Reproductive II*, 309 A.3d at 947.  On remand, the government refused that burden, the Attorney General finally arrived to defend the Coverage Exclusion, and we twice heard oral argument.

In a constitutional challenge, the government's demand for trial does not preclude summary relief by *ipse dixit*.  The asserted factual issues must be *both* disputed *and* material to the outcome.  *See Haveman v. Bureau of Pro. & Occupational Affs.*, 238 A.3d 567, 579-80 (Pa. Cmwlth. 2020) (en banc).  If, assuming the proffered facts to be in the respondent's favor and considering the parties' legal theories and the law, the asserted facts are not in dispute or not material, we will grant summary relief for the petitioner.  *See id.*; *see also, e.g., A.S. v. Pa. State Police*, 87 A.3d 914, 923 (Pa. Cmwlth. 2014) (en banc) (granting summary relief for petitioner over agency's claim of disputed material fact), *aff'd*, 143 A.3d 896 (Pa. 2016).  *But see A.S.*, 87 A.3d at 933 (Brobson, J., dissenting) (agreeing with agency's claim of disputed material fact).  We acknowledge that the *Allegheny Reproductive II* Court contemplated the potential for an evidentiary proceeding, but we do not read that mandate as overriding this general law of summary relief.

When asked at oral argument which material facts he would seek to prove, the Attorney General identified three:  (1) that some women are psychologically harmed by, or regret, abortion; (2) that fetal life exists, to be shown by expert testimony regarding fetal heartbeat; and (3) that the asserted conscience rights behind the Coverage Exclusion may impact the state budgetary process in the future.  Even taking those putative facts as true, they do not require trial.  Providers do not dispute that psychological harm around women's healthcare is a matter of "relative risk." Providers' Reply Br. at 9 (quoting the Attorney General's proffered evidence).  They obviously do not dispute that a fetus is a form of potential life.  Providers' Second Reply Br. at 10-11.  The practical effects of our decision on the budgetary process are not material to our analysis.  As we have explained here, the Commonwealth's burden is to come forward with evidence to show a compelling interest, and that the Coverage Exclusion is the least restrictive means of pursuing that interest.  The Attorney General's offered proof is not material in that, even if shown at trial, it would not allow him to prevail under that exacting legal standard.

Finally, we do not base this conclusion wholly on the Joint Statement (or Stipulations) and we certainly do not accept any stipulations of law.  *Contra Allegheny Reproductive III*, (McCullough, J., dissenting), slip op. at 16.  We ask broadly whether, assuming all facts in favor **(Footnote continued on next page…)**

27

Based on the foregoing, we conclude that the Commonwealth has failed to rebut the presumed unconstitutionality of the Coverage Exclusion—which is a sex-based classification—by showing it is the least intrusive means of pursuing compelling state interests. Accordingly, we hold that the Coverage Exclusion violates the Equal Rights Amendment and is unconstitutional.

## B. Equal Protection

We next address the challenge based on equal protection under Article I, Section 26 of the Pennsylvania Constitution.[15]

---

of the nonmovant, the movant is entitled to relief as a matter of law. *Phantom Fireworks Showrooms*, 198 A.3d at 1220. It is not dispositive for the Attorney General, at oral argument, to disclaim agreement with the Joint Statement *in general*—stipulations on which, we note, he also relies. *See* Attorney General's Br. at 24. The Attorney General has not *specifically* rebutted Providers' argument that the facts he seeks to prove are either not disputed or not material.

[15] We reach this issue despite that the first issue, based on the Equal Rights Amendment, is dispositive. Normally, principles of judicial restraint counsel that courts should not resolve multiple issues when a single issue is sufficient to resolve the case. *See Commonwealth v. Dunkins*, 263 A.3d 247, 253 n.5 (Pa. 2021). However, we believe the unique procedural posture of this case favors reaching this issue as well.

In its mandate, our Supreme Court expressly overruled *Fischer* as to *both* the Equal Rights Amendment issue and the equal protection issue. *Allegheny Reproductive II*, 309 A.3d at 947. It addressed each constitutional argument separately, and regarding the second issue, it held: "[A] court, presented with a challenge to a legislative classification that touches on the exercise of a civil right on the basis that it violates Article I, Section 26, *must* determine whether the classification operates neutrally with regard to the exercise of that right. If it does not, the court *shall* then conduct *a commensurate* means-end review." *Id.* (emphasis added). The Supreme Court ordered this Court to act consistent with that mandate. *Id.*

This matter has now gone on for seven years, during which no court has finally addressed the merits of Providers' arguments. The Supreme Court noted this delay, even at that earlier stage. *See Allegheny Reproductive II*, 309 A.3d at 912. It is in the interest of judicial economy not to delay resolution of the merits any longer with piecemeal litigation, as may occur if this Court were to address only one issue, creating the need for further remand after an appeal. We read the Supreme Court's mandate as at least authorizing us—and perhaps directing us—to address both merits issues on remand.

28

## 1. Parties' Arguments

Providers contend that the Coverage Exclusion violates the equal protection provisions because it burdens the exercise of a fundamental right: reproductive autonomy. They note as persuasive the plurality conclusion in *Allegheny Reproductive II* that reproductive autonomy is fundamental, rooted in Article I, Section 1's guarantee of privacy. They ask us to adopt that reasoning in full, basing the fundamentality of the right to reproductive autonomy on the guarantee of privacy, and also on the Equal Rights Amendment, which is further textual support for an inherent right to reproductive autonomy. Based on their view that a fundamental right is involved, they argue the Coverage Exclusion treats pregnant patients differently depending on whether they choose to carry a pregnancy to term or terminate it. This differential treatment, they assert, is a textbook burden on the right. As before, they dispute that any compelling interest lets this burden survive strict scrutiny. In the alternative, they argue the Coverage Exclusion would fail even rational basis review, because it is not rationally related to the asserted interest in protecting fetal life. Providers emphasize that the equality provisions of the Pennsylvania Constitution are more protective than their federal counterparts.

The Attorney General maintains there is no disparate treatment because Medicaid recipients who seek abortions and those who continue pregnancies are not similarly situated for purposes of equal protection analysis. By making different ultimate choices about the pregnancy, they have situated themselves differently. The state's decision to subsidize one and not the other is a policy judgment rather than a classification. The Attorney General then argues there is no fundamental right to reproductive autonomy. He correctly notes the right is not found explicitly in the Constitution. He disputes the possibility for inherent rights to be nested within one

another—in this case, an implied right to abortion within an implied right to privacy under Article I, Section 1. The Attorney General cites history, including Pennsylvania history of criminalizing some abortions, to conclude there can be no fundamental right to reproductive autonomy.

The Attorney General argues that even if some right to reproductive autonomy is fundamental, the Coverage Exclusion does not burden that right, because that right does not extend to requiring the state to *pay for* the exercise of that choice. *See* Attorney General's Br. at 33-34. The Attorney General notes that Pennsylvania courts have long held that the government's failure to subsidize a choice does not constitute an unconstitutional burden on the right to make that choice. For this reason, the Attorney General contends that strict scrutiny is unwarranted because the law neither impedes access to abortion nor penalizes the decision to seek one. Alternatively, for the same reasons as discussed *supra* relative to the Equal Rights Amendment, the Attorney General argues the Coverage Exclusion would satisfy strict scrutiny.

In reply, Providers reemphasize the Supreme Court's conclusion that the Article I, Section 26 protections are broader than, *not* in lock-step with, federal equal protection. Thus they dispute the relevance of cases like *Dobbs*, which dealt with federal substantive due process rights of a completely different nature and scope. Based on that distinction, Providers point out that the Attorney General's deep-historical analysis is misplaced—it is answering the "history and tradition" question the United States Supreme Court applies, not the fundamentality question under the Pennsylvania Constitution. Thus, that historical analysis is answering the wrong analytical question, and Providers also argue even if it were relevant, it is factually flawed. Providers argue in the alternative that even if we find no

30

fundamental right, the Coverage Exclusion fails rational basis review under the Pennsylvania Constitution, because the law is plainly not aimed at protecting fetal life, but rather at coercing birth.

## 2. Analysis

After overruling *Fischer*'s equal protection analysis, the Supreme Court explained the proper Article I, Section 26 analysis of the Coverage Exclusion this way:

> In essence, equal protections generally provide that like persons in like circumstances will be treated similarly. That does not necessarily require that all persons enjoy identical protection under the law; thus, the Commonwealth is not absolutely prohibited from classifying individuals for the purposes of receiving different treatment, so long as those classifications are appropriately justified. Based upon judicial review, pursuant to the means-end test, the courts must determine whether such a classification is constitutional. By its express terms, the Abortion Control Act creates a classification. The Coverage Exclusion differentiates between pregnant women on Medical Assistance who would seek to obtain abortions and pregnant women on Medical Assistance who would seek to carry their pregnancies to term. The former receives no government funding for the reproductive care they seek, whereas the latter receives full coverage for the reproductive care they seek. The controlling factor influencing the statutory funding scheme is how a pregnant woman on medical assistance decides to exercise her reproductive choices.
>
> Section 26 prohibits not only the denial to any person the enjoyment of any civil right, but it explicitly prohibits the discrimination against any person in the exercise of any civil right . . . . Thus, the government must maintain a position of neutrality with regard to citizens' exercise of their constitutional rights. It may only depart from this neutrality when there is a justification to sustain a legislative classification.

31

*Allegheny Reproductive II*, 309 A.3d at 945 (citations omitted). We determine "whether the classification operates neutrally with regard to the exercise of [the] right. If it does not, the court shall then conduct a commensurate means-end review." *Id.* at 947. "Commensurate" here obviously signals the concept that the scrutiny of our means-ends review changes based on the nature of the right at issue. This requires us to conduct our analysis in two logical steps: "First, we determine the nature of the right—is it fundamental or something less. Depending on the nature of the right, we conduct a means-ends analysis, i.e., scrutiny tailored to the nature of the right, to determine whether the articulated government purpose is advanced by the legislation." *Id.* at 889. Accordingly, we first examine whether the right at issue is a fundamental right.[16]

### *i. Fundamental Right*

"Fundamental rights generally are those which have their source in the Constitution." *Zauflik v. Pennsbury Sch. Dist.*, 104 A.3d 1096, 1118 (Pa. 2014). This was the rule under the Pennsylvania Supreme Court's prior approach of treating state equal protection law as coextensive with the federal Equal Protection Clause. *See Fischer*, 502 A.2d at 121 (citing *James v. Se. Pa. Transp. Auth.*, 477 A.2d 1302, 1305-06 (Pa. 1984)). With *Allegheny Reproductive II* having overruled *Fischer*'s equal protection analysis, it is clear that going forward, assessment of whether a right is fundamental in Pennsylvania will turn squarely on our Declaration of Rights and the Pennsylvania Constitution, and will not follow federal fundamental rights jurisprudence. *See Allegheny Reproductive II*, 309 A.3d at 945; *see also id.* at 970-

---

[16] Consistent with our decision to address Providers' equal protection claim in the interest of judicial economy, *see supra* n.15, we must address this issue because identifying the level of scrutiny that applies "is crucial to any equal protection claim." *Allegheny Reproductive II*, 309 A.3d at 942.

80 (Wecht, J., concurring) (noting several Declaration of Rights provisions that may prove to be sources of fundamental rights).

Because we have our own Constitution, we Pennsylvanians have our own fundamental rights. A plurality of our Supreme Court explained how the right to privacy has long been viewed as fundamental under Article I, including: the right to privacy in one's home, one's body and medical records, and one's personal identifying information. *Id.* at 899-905. Privacy is not alone. We have recognized other fundamental rights: the right to vote;[17] the right to reputation;[18] and the right to public education.[19] These are all fundamental under the Pennsylvania Constitution, regardless of their status under the United States Constitution. Fundamental rights are not some alien thing which we should be afraid to encounter, as the Attorney General seems to suggest. They are front and center in the compact of self-government the People created. *See* PA. CONST. art. I.

The claimed right is a right to "reproductive autonomy." *Allegheny Reproductive II*, 309 A.3d at 892; *id.* at 997 (Dougherty, J., concurring and dissenting). The *Allegheny Reproductive II* plurality explained how the text and history of Article I and its embedded privacy rights—including the history of abortion regulation in Pennsylvania—demonstrate that reproductive autonomy is a fundamental right. *See id.* at 896-912. It showed how this is consistent with interpretations of other state constitutions. *Id.* at 912-16. After discussing the policy implications of finding a fundamental "right to reproductive decision-making," the

---

[17] *Ctr. for Coalfield Just. v. Wash. Cnty. Bd. of Elections*, 343 A.3d 1178, 1199 (Pa. 2025).
[18] *Commonwealth v. Mucci*, 327 A.3d 1223, 1231 n.8 (Pa. Super. 2024), *appeal denied*, 340 A.3d 270 (Pa. 2025).
[19] *William Penn Sch. Dist. v. Pa. Dep't of Educ.*, 294 A.3d 537, 955-57 (Pa. Cmwlth. 2023).

33

plurality concluded:

> [T]he right we address transcends the privacy rights embedded in Sections 1 and 8 of Article I of our Constitution. In 1971, the People amended our Constitution and Article I by adopting the Equal Rights Amendment. As discussed, the Amendment was intended to enshrine equality of the sexes in our Commonwealth and to rectify centuries of subjugation of the rights of women. This would be a hollow promise if women did not possess the ability to control their destiny. Whether or not to carry a pregnancy, whether or not to give birth, whether or when to expand the size of their families, whether or when to make career, employment or other changes in the course of their lives are all decisions central to self-determination and ultimately, to equality in society.

> The right to reproductive autonomy is the right to self-determination. While the right has been presented to us in terms of making the decision "to choose to end or continue a pregnancy," it implicates the broader proposition that individuals have the right to make important reproductive healthcare decisions—a gender neutral right to make decisions without governmental intrusion into those private matters that play a defining role in the course of a lifetime. Our Constitution guarantees equality in the exercise of this right. The right of all individuals to be left alone to pursue happiness and enjoy liberty is central to our compact with the government.

*Id.* at 916-17 (footnotes omitted).

We find the plurality's reasoning and conclusion highly persuasive and adopt them as our own. We agree with Providers that recognizing this fundamental right, as the plurality did, is necessary to restrict state government to its proper sphere, thus protecting our liberty. *See* Providers' Br. at 33-35. This will mean that the state will face judicial scrutiny of its attempts to coerce reproductive choice.

34

Those choices are the People's, not the government's.[20]   As with the other

[20] Judge Wallace dissents, opining that our recognition of a fundamental right reflects a lack of judicial restraint, a violation of the separation of powers, and a judicial "power grab." *Allegheny Reproductive III* (Wallace, J., dissenting), slip op. at 1, 8-10.   We respectfully disagree.

"All power is inherent in the people . . . ." PA. CONST. art. I, § 2.  The People enacted a Constitution, which does nothing if it does not *limit* the power of government to interfere with civil rights and liberties that are "excepted out of the general powers of government." PA. CONST. art. I, § 25. The Pennsylvania Constitution was painstakingly built around the core concept of limited government.  *See Allegheny Reproductive III* (Wojcik, J., concurring), slip op. at 23-26.  It is Pennsylvania's supreme law. It binds the legislature, the executive, and the judiciary, and it is the judiciary's duty to determine "what is within the bounds of our Charter" when that question is properly presented. *Allegheny Reproductive II*, 309 A.3d at 847; *see* PA. CONST. art. V.

Of course that means that judges should recognize our limited role, too.  We do not invent new rights.  But we cannot let healthy judicial restraint curdle into judicial abdication.  We should not shirk our duty to interpret the Constitution correctly when squarely asked, even if the political branches would rather we not worry about it.  We have learned that lesson the hard way.  *See Plessy v. Ferguson*, 163 U.S. 537, 552 (1896) (denying claimed right to be free from racial segregation by government); *Korematsu v. United States*, 323 U.S. 214, 223 (1944) (denying claimed right against imprisonment in a concentration camp based on ancestry).  When a court recognizes an extant constitutional right—even if the right has been denied before or is hotly contested—it is seeing something that was always there in the Constitution. *See Brown v. Bd. of Educ.*, 347 U.S. 483, 495 (1954) (overruling *Plessy*).  Constitutional rights are fixed—they do not move with the "evolving and ever-changing voice" of the popular will.  *Contra Allegheny Reproductive III* (Wallace, J., dissenting), slip op. at 10.  That is why *Korematsu* was "gravely wrong the day it was decided." *Trump v. Hawaii*, 585 U.S. 667, 710 (2018) (repudiating *Korematsu*).  Courts did not need to invent new rights to see *Plessy* and *Korematsu* for the legal errors and poor reasoning that they were.   They need only recognize that the Constitution has knowable content and meaning, and then faithfully understand and apply it when presented with the question.

In this case, we have clear and detailed instructions on remand to address two constitutional questions.  *Allegheny Reproductive II*, 309 A.3d at 947.  One of those issues *requires us*, via binding precedent, to consider as part of the analysis whether a statute burdens a fundamental right. *Id.* at 946.  That is what we have aimed at here.  Not "because [we] want[] to." *Contra Allegheny Reproductive III* (Wallace, J., dissenting), slip op. at 9.  Because "we *must.*" *Learning Res., Inc. v. Trump*, 607 U.S. ___, No. 24–1287, slip op. at 20 (Feb. 20, 2026) (opinion of Roberts, C.J.) (emphasis added).   We leave the rest of this conversation to the Pennsylvania Supreme Court— the ultimate arbiter of our Constitution's meaning—and to the "court of history." *Trump v. Hawaii*, 585 U.S. at 710.

fundamental rights, however, the right is not absolute. *See Allegheny Reproductive II*, 309 A.3d at 917. For that reason, we are not persuaded that recognizing this fundamental right will "short-circuit" political engagement with the issue of abortion. Attorney General's Br. at 60. Our decades-old recognition of the fundamental right to vote has, to put it mildly, not short-circuited debate over election policy in this Commonwealth, and it is far from the last judicial word on that subject. Recognizing the fundamental right to reproductive autonomy is an initial analytical step, but it then requires the proper level of scrutiny be applied to the governmental action. We now turn to that analysis.

*ii. Strict Scrutiny*

The Coverage Exclusion allocates funding—or withholds funding—for a woman's medical care. "The controlling factor influencing the statutory funding scheme is how a pregnant woman on Medical Assistance decides to exercise her reproductive choices." *Allegheny Reproductive II*, 309 A.3d at 945. Thus, we conclude that the Coverage Exclusion does not operate neutrally with respect to a person's exercise of the fundamental right to reproductive autonomy. Accordingly, the commensurate means-ends review is strict scrutiny, which the Supreme Court plurality explained, citing authority, as follows:

> A statute that discriminates against any person in the exercise of a fundamental right is deemed unconstitutional unless the state can demonstrate it is "necessary to the achievement of a compelling state interest." *Commonwealth v. Bell*, . . . 516 A.2d 1172, 1178 ([Pa.] 1986). In other words, the lower court "must determine if the infringement is supported by a compelling state interest and if the infringement is narrowly tailored to effectuate that interest." *Hiller v. Fausey* . . . , 904 A.2d 875, 885-86 ([Pa.] 2006). The state bears a heavy burden of justification, and the statute must be closely scrutinized in light of its asserted purposes. *Dunn v. Blumstein*, 405

36

> U.S. 330, 342-43, . . . (1972). The statute must be drawn with precision and tailored to serve its legitimate objectives. *Id*. at 343 . . . . "[I]f there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference. If it acts at all, it must choose 'less drastic means.'" *Id*. (internal citation omitted).

*Allegheny Reproductive II*, 309 A.3d at 946.

In his brief, the Attorney General treats both the Equal Rights Amendment and equal protection issues as being controlled by the same strict scrutiny standard. *See* Attorney General's Br. at 14, 29-30; *see also Allegheny Reproductive II*, 309 A.3d at 977 n.193 (Wecht, J., concurring) ("Although the Majority does not designate its approach [to the Equal Rights Amendment] as strict scrutiny, I understand the searching judicial inquiry that it articulates to be just that."). We agree with Justice Wecht that the strict scrutiny analysis for equal protection purposes is substantially the same as that for our Equal Rights Amendment analysis above. The Attorney General does not advance any distinct compelling interest that relates to the equal protection analysis, beyond the three interests identified earlier. Because we have already concluded that (1) those interests are not compelling, and (2) the Coverage Exclusion is not the least restrictive means of pursuing them, we see no opportunity for a different conclusion here. Accordingly, we conclude that the Commonwealth has not met its heavy burden of justification for the Coverage Exclusion on this Count either. *See Dunn*, 405 U.S. at 342-43. We see no issue of material fact that would allow it to do so at trial. Accordingly, the Coverage Exclusion facially violates the equal protection provisions of the Pennsylvania Constitution.

37

### iii. Rational Basis Review

Lastly, we agree with Providers that even if we were not to recognize a fundamental right to reproductive autonomy, and thus were to apply a lesser degree of scrutiny, we would still grant summary relief to them on other grounds. If the classification implicates "neither suspect classes nor fundamental rights[, it] will be sustained if it meets a 'rational basis' test." *Allegheny Reproductive II*, 309 A.3d at 918 (quoting *James*, 477 A.2d at 1305-06). Neither choosing to have an abortion, nor reliance on Medical Assistance, is a suspect class, so if no fundamental right is at issue, rational basis review applies. Under that test, a legislative classification must be sustained "unless it is 'patently arbitrary' and bears no rational relationship to a legitimate governmental interest." *Singer v. Sheppard*, 346 A.2d 897, 905 (Pa. 1975) (quoting *Frontiero v. Richardson*, 411 U.S. 677, 683 (1973)).

Conceding that the three interests the Attorney General asserts—preserving fetal life, protecting women's heath, and protecting the conscience rights of those who oppose state-funded abortion—may be legitimate governmental interests, the coverage exclusion is not rationally related to those interests. On the first interest, the Coverage Exclusion contains no exception allowing an abortion even when it is known, *to a medical certainty*, that the fetus will not survive birth. If such a complete absence of potential life is not enough to allow an abortion under the Coverage Exclusion—and it is not—then the exclusion is not rationally related to an interest in preserving potential life. *See Allegheny Reproductive II*, 309 A.3d at 956 (Wecht, J., concurring). It must be pursuing some other interest, or no coherent interest at all.

On the second interest—women's health—the Attorney General seeks to prove by evidence that some women, under some circumstances, have suffered

38

psychological harm from abortion. While neither comparing nor minimizing anyone's suffering, we note that the Attorney General does not dispute the parties' stipulated facts that women have also suffered concrete medical harms in the course of pregnancy, including pregnancies that they were coerced into carrying to term because of the Coverage Exclusion. Joint Statement ¶¶ 33, 47-57. We agree with Providers that "[i]t is simply irrational to refuse to facilitate prompt access to health care for people carrying a pregnancy with severe or fatal anomalies, or people whose health is threatened by the pregnancy, based on a government interest in encouraging those people to stay pregnant against their will." Providers' Br. at 46.

On the third interest—protecting taxpayers' conscience rights—it is not clear what the Attorney General means by "conscience." If the interest is in favoring one group of taxpayers' religious beliefs by making tax expenditures that favor those beliefs over other citizens' contrary beliefs of conscience, that does not seem like a legitimate state interest. *See* The Establishment Clause, U.S. CONST. Amend. I; *Allegheny Reproductive II*, 309 A.3d at 968-69 (Wecht, J., concurring) (discussing Establishment Clause); *id.* at 980 (discussing Pennsylvania Constitution's Article I, Section III "rights of conscience"). In contrast, if the interest is content-neutral—a desire to protect the conscience rights of *all* similarly situated taxpayers who oppose government use of their tax payments for objectionable things—then the Coverage Exclusion is only selectively, not rationally, related to that interest. The conscience interest the Coverage Exclusion protects is extremely narrow: it is only the interest of those who oppose state-funded abortion for women who rely on Medical Assistance, except in cases where the life of the mother is at risk and cases of rape or incest, but with no exception for the mother's health or the viability of the fetus. It is irrational for the Coverage Exclusion to protect only that very narrow conscience

interest and no others.

Thus, even if rational basis review applied, we would find the Coverage Exclusion does not withstand that review because it is not rationally related to any of the claimed state interests.

## IV. CONCLUSION

For the foregoing reasons, we conclude that the Coverage Exclusion violates the Equal Rights Amendment in Article I, Section 28 of the Pennsylvania Constitution. Further, we conclude that Article I of the Pennsylvania Constitution guarantees a fundamental right to reproductive autonomy, that the Coverage Exclusion does not operate neutrally with respect to that right and is not properly justified in doing so, and accordingly the Coverage Exclusion violates the equal protection guarantee in Article I, Section 26 of the Pennsylvania Constitution. Providers are entitled to summary relief in their favor on both Counts of the Petition.

_____
MATTHEW S. WOLF, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Allegheny Reproductive Health Center, :
Allentown Women's Center, Delaware :
County Women's Center, Philadelphia :
Women's Center, Planned Parenthood :
Keystone, Planned Parenthood :
Southeastern Pennsylvania, and Planned :
Parenthood of Western Pennsylvania, :
               Petitioners :
                           :
          v. : No. 26 M.D. 2019
                           :
Pennsylvania Department of Human :
Services, Teresa Miller, in her official :
capacity as Secretary of the :
Pennsylvania Department of Human :
Services, Leesa Allen, in her official :
capacity as Executive Deputy Secretary :
for the Pennsylvania Department of :
Human Service's Office of Medical :
Assistance Programs, and Sally Kozak, :
in her official capacity as Deputy :
Secretary for the Pennsylvania :
Department of Human Service's :
Office of Medical Assistance Programs, :
               Respondents :

# **O R D E R**

AND NOW, this 20th day of April 2026, Petitioners' Application for Summary Relief is GRANTED. It is hereby DECLARED that Section 3215(c) and (j) of the Pennsylvania Abortion Control Act, 18 Pa.C.S. §§ 3215(c) & (j) (Coverage Exclusion) is unconstitutional, as it violates the Pennsylvania Constitution's Equal Rights Amendment, PA. CONST. art. I, § 28, and the Pennsylvania Constitution's

equal protection guarantees, PA. CONST. art. I, §§ 1, 26.  The Commonwealth is permanently ENJOINED from enforcing the Coverage Exclusion and its associated regulations.


_____

MATTHEW S. WOLF, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Allegheny Reproductive Health Center,          :
Allentown Women's Center,                      :
Delaware County Women's                        :
Center, Philadelphia Women's Center,           :
Planned Parenthood Keystone, Planned           :
Parenthood Southeastern Pennsylvania, and      :
Planned Parenthood of Western Pennsylvania,    :
                                               :
                        Petitioners            :
                                               :
              v.                               : No. 26 M.D. 2019
                                               : Argued: November 5, 2025
Pennsylvania Department of Human Services,     :
Teresa Miller, in her official capacity as     :
Secretary of the Pennsylvania Department of    :
Human Services, Leesa Allen, in her official   :
capacity as Executive Deputy Secretary for the :
Pennsylvania Department of Human Service's     :
Office of Medical Assistance Programs, and Sally :
Kozak, in her official capacity as Deputy Secretary :
for the Pennsylvania Department of Human       :
Service's Office of Medical Assistance Programs, :
                                               :
                        Respondents            :

BEFORE:    HONORABLE RENEE COHN JUBELIRER, President Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE ANNE E. COVEY, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE LORI A. DUMAS, Judge
           HONORABLE STACY WALLACE, Judge
           HONORABLE MATTHEW S. WOLF, Judge

CONCURRING OPINION
BY JUDGE WOJCIK                                FILED:  April 20, 2026

        I fully join the thorough and well-reasoned rationale of the Majority

Opinion granting summary relief to the Petitioners in this matter pursuant to the

Supreme Court's remand order in *Allegheny Reproductive Health Center v.*

*Pennsylvania Department of Human Services*, 309 A.3d 808 (Pa. 2024).[1]  I write separately to emphasize the clear and unbroken line of the foundational legal documents establishing a fundamental right to personal freedom, equality, and tolerance[2] in this great Commonwealth of ours that compel this result as well.

---

[1] With respect to the Supreme Court's remand instructions, Pa.R.A.P. 2591(a) states, in pertinent part:  "On remand of the record the court . . . below shall proceed in accordance with the judgment or other order of the appellate court[.]"  *See also* Section 706 of the Judicial Code, 42 Pa. C.S. §706 ("An appellate court may affirm [or] vacate . . . any order brought before it for review, and may remand the matter and . . . require the entry of such appropriate order . . . as may be just under the circumstances.").  "[I]t has long been the law in Pennsylvania that following remand, a lower court is permitted to proceed only in accordance with the remand order." *Commonwealth v. Sepulveda*, 144 A.3d 1270, 1280 n.19 (Pa. 2016).

[2] As a historian of colonial Pennsylvania has observed:

> The concept of toleration, important for the national experience and for many of the other colonies, is of less significance for Pennsylvania.  Toleration implies a concession of privileges by a controlling or dominant faction to a minority group, not the unhindered exercise of inherent rights.  Pennsylvania was not founded on the principle of toleration, but of tolerance.  Tolerance describes liberal attitudes toward other religious, national, or cultural groups, an acceptance of the right not to conform and to hold different beliefs.  Although William Penn's goal was to establish, in almost absolute terms, religious liberty, with the expectation that mutual tolerance would prevail, Penn, Pennsylvanians, and contemporary observers often described conditions in the colony as "toleration," for it was the only frame of reference available in the context of eighteenth-century political theory.

Scott Douglas Gerber, *Law and the Holy Experiment in Colonial Pennsylvania*, 12 N.Y.U. J. L. & Liberty 618, 620 (2019) (quoting Sally Schwartz, *"A Mixed Multitude": The Struggle for Toleration in Colonial Pennsylvania*, 9 (N.Y.U. Press 1987)).

The status of the "Society of Friends," or "Friends," or "Quakers[3]" as one of the preeminent agents of global peace and social change[4] during its over 300-

---

[3] As another Pennsylvania historian has noted:

> The early friends had been recruited largely from the lower strata of society, from the artisans, shopkeepers, domestic servants, yeoman farmers and husbandmen of Commonwealth and Restoration England. By the practice of the economic virtues of diligence, prudence, and thrift, they had risen in the course of years to the status of substantial and respected upper-middle-class citizens. A little aloof, perhaps, from "the world" and its follies, preserving their character as a "peculiar people" by certain singularities of dress and address, they had attained, both in England and in the colonies, to a secure place in the upper ranks of society. In Philadelphia, whither they had migrated a half century earlier [in the late 1600's] as craftsmen, shopkeepers, and small farmers, they now constituted a mercantile aristocracy, sharing their social position only with the more fashionable Anglicans.

Frederick B. Tolles, "Quietism Versus Enthusiasm: The Philadelphia Quakers and the Great Awakening," *The Pennsylvania Magazine of History and Biography*, Vol. 69, No. 1 (Jan. 1945), at 27-28 (footnote omitted). In addition, regarding the practice of faith, "[t]he Quaker characteristically emphasized the inward working of the Holy Spirit, the Christ formed in man's soul, whereas the Evangelical rested his faith on the objective historic Christ and His vicarious atonement." *Id.* at 30.

Regarding the Quakers' current beliefs, the Philadelphia Yearly Meeting has explained:

> The essential experience of Friends is that of a direct, unmediated relationship with the Divine. Friends have used many terms or phrases to refer to the inner certainty of our faith: the Light Within, the Inner Light, the Christ Within, the Inward Teacher, the Divine Presence, Spirit, the Great Spirit, the Spirit of Truth, that of God in every person, and the Seed. In his journal, George Fox referred to "that Inward Light, Spirit, and Grace by which all might know their salvation" and to "that Divine Spirit which would lead them all into truth." Today Friends continue to use these terms and have added others out of a sense of ongoing revelation. For some Friends, "spiritual energy" best describes their personal experience

**(Footnote continued on next page…)**

of that which enlivens and empowers them in seeking truth for themselves and in community.  In contrast with early Friends, not all Friends today consider themselves to be Christians or even theists.  Friends come from very diverse religious backgrounds and experiences and apply their different perspectives as they encounter the Light Within.  Regardless of the journey that brings individuals to explore the Quaker way, the invitation to enter into an unmediated, inward relationship with the Divine continues to be at the heart of Quaker experience.

PHILADELPHIA YEARLY MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS (PHILADELPHIA YEARLY MEETING), FAITH AND PRACTICE, 4-5 (2018).

[4] Indeed, in "award[ing] th[e 1947 Nobel] Peace Prize to the Quakers, represented by their two great relief organizations, the Friends Service Council in London and the American Friends Service Committee in Philadelphia," the Nobel Committee Chairman summarized the Quakers' commitment to equality, tolerance, and social change, as follows:

> The Quakers took part in creating the first peace organization in 1810 and since then have participated in all active peace movements.  I would mention Elizabeth Fry, John Woolman, and other Quakers active in the fight against slavery and in the struggle for social justice.  I would mention the liberal idealist John Bright, his forty-year fight against the principles of war and for the principles of peace, his opposition to the Crimean War, and his struggle against [British Prime Minister] Palmerston's policies.  Many other examples could be mentioned to show how their active participation in community work, in politics if you prefer, increased during the nineteenth century.
>
> Yet it is not this side of their activities – the active political side – which places the Quakers in a unique position.  It is through silent assistance from the nameless to the nameless that they have worked to promote the fraternity between nations cited in the will of Alfred Nobel.  Their work began in the prisons.  We heard about them from our seamen who spent long years in prison during the Napoleonic Wars.  We met them once again during the Irish famine of 1846-1847.  When English naval units bombarded the Finnish coast during the Crimean War, the Quakers hurried there to heal the wounds of war, and we found them again in France after the ravages of the 1870-1871 war.

**(Footnote continued on next page…)**

MHW-4

When the First World War broke out, the Quakers were once more to learn what it was to suffer for their faith. They refused to carry arms, and many of them were thrown into prison, where they were often treated worse than criminals. But it is not this that we shall remember longest. We who have closely observed the events of the First World War and of the inter-war period will probably remember most vividly the accounts of the work they did to relieve the distress caused by the war. As early as 1914, the English Quakers started preparation for relief action. They began their work in the Marne district in France and, whenever they could, they went to the very places where the war had raged. They worked in this way all through the war and when it ended were confronted by still greater tasks. For then, as now, hunger and sickness followed in the wake of the war. Who does not recall the years of famine in Russia in 1920-1921 and [Nobel Laureate Fridtjof] Nansen's appeal to mankind for help? Who does not recall the misery among the children in Vienna which lasted for years on end? In the midst of the work everywhere were the Quakers. It was the Friends Service Committee which, at [President] Hoover's request, took on the mighty task of obtaining food for sick and undernourished children in Germany. Their relief corps worked in Poland and Serbia, continued to work in France, and later during the civil war in Spain rendered aid on both sides of the front.

Through their work, the Quakers won the confidence of all, for both governments and people knew that their only purpose was to help. They did not thrust themselves upon people to win them to their faith. They drew no distinction between friend and foe. . . .

The Second World War did not strike the Quakers personally in the same way as did that of 1914. Both in England and in the U.S.A. the conscription laws allowed the Quakers to undertake relief work instead of performing military service; so they were neither cast into prison nor persecuted because of their unwillingness to go to war. In this war there were, moreover, Quakers who did not refuse to take an active part in the war, although they were few compared with those who chose to help the victims of war. When war came, the first task which confronted them was to help the refugees. But the difficulties were great because the frontiers of many countries were soon closed. . . . Nevertheless, they worked where they could, first undertaking welfare work in England and after that, behind the front

**(Footnote continued on next page…)**

in many countries of Europe and Asia, and even in America. For when America joined the war, the whole Japanese[]American population, numbering 112,000 in all, of whom 80,000 were American citizens, was evacuated from the West Coast. The Quakers went to their assistance, as well as opposed the prevailing anti-Japanese feeling from which these people suffered.

Now, with the war over, the need for help is greater than ever. This is true not only in Europe, but also and to the same degree in large areas of Asia. The problems are becoming more and more overwhelming – the prisoners who were released from concentration camps in 1945, all those who had to be repatriated from forced labor or POW camps in enemy countries, all the displaced persons who have no country to which they can return, all the homeless in their own countries, all the orphans, the hungry, the starving! The problem is not merely one of providing food and clothing, it is one of bringing people back to life and work, of restoring their self-respect and their faith and confidence in the future. Once again, the Quakers are active everywhere. As soon as a country has been reopened they have been on the spot, in Europe and in Asia, among countrymen and friends as well as among former enemies, in France and in Germany, in India and in Japan. . . .

Today the Quakers are engaged in work that will continue for many years to come. But to examine in closer detail the individual relief schemes would not give us any deeper insight into its significance. For it is not in the extent of their work or in its practical form that the Quakers have given most to the people they have met. It is in the spirit in which this work is performed. "We weren't sent out to make converts," a young Quaker says: "we've come out for a definite purpose, to build up in a spirit of love what has been destroyed in a spirit of hatred. We're not missionaries. We can't tell if even one person will be converted to Quakerism. Things like that don't happen in a hurry. When our work is finished it doesn't mean that our influence dies with it. We have not come out to show the world how wonderful we are. No, the thing that seems most important is the fact that while the world is waging a war in the name of Christ, we can bind up the wounds of war in the name of Christ. Religion means very little until it is translated into positive action."

\* \* \*

**(Footnote continued on next page…)**

year history is beyond question.  Relevant here, gender equality has been a guiding precept in the Quaker faith from its establishment, which continues to this day.[5]

---

The Quakers have shown us that it is possible to translate into action what lies deep in the hearts of many: compassion for others and the desire to help them – that rich expression of the sympathy between all men, regardless of nationality or race, which, transformed into deeds, must form the basis for lasting peace.  For this reason alone the Quakers deserve to receive the Nobel Peace Prize today.

But they have given us something more: they have shown us the strength to be derived from faith in the victory of the spirit over force.

Gunnar Jahn, Nobel Awards Presentation Speech (Dec. 10, 1947) (transcript available at https://www.nobelprize.org/prizes/peace/1947/ceremony-speech/#not_8) (footnotes omitted) (last visited April 7, 2026).

[5] The gender equality in the Quaker faith may emanate from the fact that women participated in its initial establishment.  *See, e.g.*, Bonnelyn Young Kunze, "Religious Authority and Social Status in Seventeenth Century England: The Friendship of Margaret Fell, George Fox, and William Penn," *Church History*, Vol. 57, No. 2 (Jun., 1988), pp. 170-86.  Moreover, in Pennsylvania, it is clearly evidenced by the ratification of our Equal Rights Amendment (ERA), Pa. Const. art. I, §28, by the citizens of this Commonwealth on May 18, 1971.  This ratification occurred long before a national ERA was ever considered or passed by the federal Congress, preceding its ratification by the states, or the Supreme Court's decision in *Roe v. Wade*, 410 U.S. 113 (1973), recognizing a national, but limited, right to abortion.

Moreover, our ERA was immediately effective upon its ratification in May of 1971.  As the Supreme Court has explained:

The thrust of the [ERA] is to insure equality of rights under the law and to eliminate sex as a basis for distinction.  The sex of citizens of this Commonwealth is no longer a permissible factor in the determination of their legal rights and responsibilities.  The law will not impose different benefits or burdens upon the members of a society based on the fact that they may be man or woman.

**(Footnote continued on next page…)**

MHW-7

Following the Crown's grant of a charter for the colony of Pennsylvania,[6] William Penn composed a number of drafts of the *Frame of*

> We have not hesitated to effectuate the [ERA]'s prohibition of sex discrimination by striking down statutes and common law doctrines "predicated upon traditional or stereotypic roles of men and women . . . ." *Commonwealth ex rel. Spriggs v. Carson*, [368 A.2d 635, 639 (Pa.] 1977) (plurality opinion) ("Tender years doctrine" offends concept of equality of the sexes embraced in [ERA]); *see Adoption of Walker*, [360 A.2d 603 (Pa.] 1976) (Adoption Act's failure to require parental consent of unwed father as well as unwed mother violates [ERA].); *Butler v. Butler*, [347 A.2d 477 (Pa. ]1975) (Presumption that where husband obtains his wife's property without adequate consideration a trust is created in his wife's favor abolished.); *Commonwealth v. Santiago*, [340 A.2d 440 (Pa.] 1975) (Doctrine of "coverture" requiring presumption that wife who commits crime in presence of husband was coerced by husband discarded.); *Di Florido v. Di Florido*, [331 A.2d 174 (Pa.] 1975) (Presumption that husband is owner of household goods used and possessed by both spouses abolished.); *Commonwealth v. Butler*, [328 A.2d 851 (Pa.] 1974) (Statutory scheme under which women are eligible for parole immediately upon incarceration while men must serve minimum sentence violates [ERA].); *Henderson v. Henderson*, [327 A.2d 60 (Pa. 1974)], (Statute providing for alimony *pendente lite*, counsel fees and expenses in divorce action for wife but not husband violates [ERA]); *Conway v. Dana*, [318 A.2d 324 (Pa.] 1974) (Presumption that father must bear principal burden of support of minor children abolished.); *cf. Hopkins v. Blanco*, [320 A.2d 139 (Pa.] 1974) ([ERA] requires that wife as well as husband be permitted to recover for loss of consortium.) Gender-based rates such as [the insurance company's] rely on and perpetuate stereotypes similar to those condemned in the above cases.

*Hartford Accident and Indemnity Co. v. Insurance Commissioner*, 482 A.2d 542, 547-48 (Pa. 1984) (citation omitted). In short, since that time, our citizenry has replaced the word "man" and "men" with "woman" and "women." The Pennsylvania Constitution reads much differently when viewed in this manner.

[6] The charter granted to William Penn significantly differed from the other colonial charters:

**(Footnote continued on next page…)**

*Government* that he wished to establish here. Penn's second completed and approved *Frame of Government* "was Pennsylvania's first operating constitution." JEAN R. SODERLUND, ET AL., EDS., WILLIAM PENN AND THE FOUNDING OF PENNSYLVANIA 1680-1684: A DOCUMENTARY HISTORY 265 (U. Penn. Press 1983). Remarkably, "Penn's set of laws was truly innovative in one essential aspect. It was the first constitution that specified a method for its own amendment." HANS FANTEL, WILLIAM PENN: APOSTLE OF DISSENT 156 (Morrow 1974).[7]

---

All the English proprietary charters except that of Pennsylvania gave the proprietors the powers of the Bishop of Durham -- a grant equivalent to independent sovereignty, limited only by loyalty to the King. In Penn's charter, the King somewhat modified the traditional powers of the proprietor. Penn received no right to grant titles of nobility and he had to submit provincial laws to the King for approval, to acknowledge the right of Parliament to tax the colony, to maintain a provincial agent in London, and to present all Pennsylvania laws to "the freemen" or to "their delegates" for their approval.

But except for these restrictions, the charter granted Penn "absolute power" over his principality. He had the sole authority to make laws, levy taxes, coin money, regulate commerce, appoint provincial officials, administer justice, grant pardons, make war, erect manors, sell land, and perform all other acts pertaining to sovereignty. The charter gave Penn the broadest latitude in planning the details of the political structure and administration of his province.

PHILIP S. KLEIN & ARI HOOGENBOOM, A HISTORY OF PENNSYLVANIA 36-37 (2d ed. 1980).

[7] In relevant part, the *Frame of Government* states:

XXIV. That no act, law, or ordinance whatsoever, shall, at any time hereafter be made or done by the Proprietary and Governor of this province hereunto belonging, his heirs or assigns, or by the freemen in provincial Council or Assembly to alter, change, or diminish the form or effect of this charter, or any part or clause thereof, contrary

**(Footnote continued on next page…)**

In particular, Penn initially permitted amendment to the *Frame of Government* to address one significant hurdle that he encountered in the crafting of this Commonwealth's constitution.  To wit:

> As a Quaker and a pacifist, Penn was particularly concerned with the problem of violence in statecraft.  He was realist enough to know that every previously known form of government ultimately rested on force.  He knew that when reason, sentiment, and especially religion are invoked by the state, it is often merely to hide the ready sword.  Like other political theorists of the time, notably Hobbes, Penn regarded the state as a contract between rulers and ruled.  But even if the rule was democratic self-rule, the power of the government lay ultimately in its ability to punish, in extreme cases by the selective killing of disruptive persons.  As Hobbes put it, "Covenants without swords are but words."  How, then, could governance be reconciled with the Quaker ideal of nonviolence?

> Penn realized that this was a basically insoluble problem.  The best he could do was to draw up a legal code designed to forestall extreme internal stress.  In the narrow sense, this meant finding a way to accommodate dissent within the law.  In a broader sense, it meant that Penn had to create a social climate to liberate the moral potential of man so that the freely given word would become a sufficient instrument of contract, rendering the sword needless. Personal enmity, of course, might still occur, but not class or group hatred.  He believed his *Frame of Government* was the best available blueprint for such a society.

---

to the true intent and meaning thereof, without the consent of the Proprietary and Governor, his heirs or assigns, and six parts of seven of the said freemen in provincial Council and Assembly met.

*The Frame of Government of the Province of Pennsylvania and, Territories thereunto annexed, in America* (February 2, 1683) (accessed at https://avalon.law.yale.edu/17th_century/pa05.asp) (last visited April 17, 2026).

The state projected by Penn was a true "civil" society, in marked contrast to the rigid theocracies established by the Puritans in New England. The Puritans formulated their legal codes on ancient biblical concepts. Their community was conceived as a fixed structure, an unalterable covenant with God in the old Hebrew sense. Because the Quakers were free of that ancient Near Eastern and essentially despotic notion of the divine covenant, it was possible for Penn to establish the first legal framework for a fluid democratic society, open to the development of new social norms. This surely ranks among Penn's most profound achievements.

FANTEL at 157-58.[8]

Subsequently, following changes in sovereign and Penn's return to proprietorship,

word came that the English government was planning a unification of the American colonies for defense and might bring them all under the Crown. Penn arranged to leave for England in the fall of 1701 to resist this proposal, but some government would have to be created for Pennsylvania to serve in his absence. The Assembly had

---

[8] As has been noted:

The first to recognize the importance of Penn's political theories was Voltaire, almost a century after the fact. In his *Lettres philosophiques*, he credits Penn with creating "that golden age of which men talk and which probably has never existed anywhere but Pennsylvania." Clearly this is hyperbole. But Voltaire was writing under stress. Struggling in exile against French absolutism, he saw in Penn's liberal constitution indeed the token of a golden age. A later historian, Brent Barksdale, confirms Voltaire's judgment and declares flatly: "The government that William Penn established in 1682 was far more liberal and responsible to the people than any antecedent or contemporary form on earth. In the wilds of Pennsylvania he set up the only government in the known world that did not maintain a military defense against foreign invasion or internal uprising."

FANTEL at 158.

discussed a new constitution, but had shown no hurry to reach a decision. Now the time for action had come. After a brief debate, the Assembly agreed to a constitution which essentially placed the governing power in its own hand, and asked Penn for approval. He hurriedly agreed, and on October 28, 1701, Pennsylvania's fourth constitution, known as the *Charter of Privileges*, became law.

KLEIN & HOOGENBOOM at 32. *See Charter of Privileges Granted to the Inhabitants of Pennsylvania and Territories* (*Charter of Privileges*) (October 28, 1701) (accessed at https://avalon.law.yale.edu/18th_century/pa07.asp#1) (last visited April 17, 2026). "This [*Charter of Privileges*] was granted by William Penn, with the approbation of the General Assembly, and remained in force until the [American] Revolution." *Id.* at n.1.

The first section of this *Charter of Privileges* boldly states:

BECAUSE no People can be truly happy, though under the greatest Enjoyment of Civil Liberties, if abridged of the Freedom of their Consciences, as to their Religious Profession and Worship: And Almighty God being the only Lord of Conscience, Father of Lights and Spirits; and the Author as well as Object of all divine Knowledge, Faith and Worship, who only doth enlighten the Minds, and persuade and convince the Understandings of People, I do hereby grant and declare, ***That no Person or Persons, inhabiting in this Province or Territories, who shall confess and acknowledge One almighty God***, the Creator, Upholder and Ruler of the World; ***and profess him or themselves obliged to live quietly under the Civil Government, shall be in any Case molested or prejudiced, in his or their Person or Estate, because of his or their conscientious Persuasion or Practice, nor be compelled*** to frequent or maintain any religious Worship, Place or Ministry, contrary to his or their Mind, or ***to do or suffer any other Act or Thing, contrary to their religious Persuasion***.

*Id.*, §I (emphasis added).

A prolific writer, William Penn had previously explained his meaning, defining "liberty of conscience," as follows:

> . . . First, by liberty of conscience, we mean not only a mere liberty of mind, in believing or disbelieving this or that principle or doctrine. But we also believe such liberty protects a visible way of worship, a way of worship we believe to be required of us by God. If we neglect this wor[]ship for fear or favor of mortal man, we sin and are in danger of divine wrath.

> Second, by restraint or persecution, we do not only mean the strict requiring of us to believe this to be true or that to be false, and upon refusal to receive the penalties given in such cases. But by those terms we mean this much: any coercion, force or hindrance which prevents our meeting together to perform those religious exercises which are accord[]ing to our faith and persuasion.

> We wish to put the question in this way. Is it not true that persecution against persons exercising their liberty of conscience reduces the honor of God? Does it not also defile the Christian religion, violate the authority of Scripture, and go against the principles of common reason? Finally, does it not destroy the well-being of government itself?

> Concerning the honor of God, we say that restraint and persecution for matters relating to conscience directly invade the divine right, and rob the Almighty of that which belongs to none but Himself . . . .

CONSTITUTIONAL DEBATES ON FREEDOM OF RELIGION: A DOCUMENTARY HISTORY 17 (John J. Patrick & Gerald P. Long, eds. 1999) (quoting WILLIAM PENN, THE GREAT CASE OF LIBERTY OF CONSCIENCE ONCE MORE BRIEFLY DEFENDED AND DEBATED 1 (London, 1670)).

Likewise, the first two articles of our first constitution following the American Revolution provided, "A Declaration of the Rights of the Inhabitants of the Commonwealth or State of Pennsylvania," and stated:

> I. ***That all men are born equally free and independent, and have certain natural, inherent and inalienable rights, amongst which are***, the enjoying and defending life and liberty, acquiring, possessing and protecting property, and ***pursuing and obtaining happiness and safety***.

> II. That all men have a natural and unalienable right to worship Almighty God according to the dictates of their own consciences and understanding: And that no man ought or of right can be compelled to attend any religious worship, or erect or support any place of worship, or maintain any ministry, contrary to, or against, his own free will and consent: ***Nor can any man, who acknowledges the being of a God, be justly deprived or abridged of any civil right as a citizen, on account of his religious sentiments or peculiar mode of religious worship: And that no authority can or ought to be vested in, or assumed by any power whatever, that shall in any case interfere with, or in any manner controul*** [sic]***, the right of conscience in the free exercise of religious worship.***

Pa. Const. art. I and II (September 18, 1776) (emphasis added) (accessed at https://www.paconstitution.org/wp-content/uploads/2017/11/const-1776-pa-archives-vol10.pdf) (last visited April 17, 2026).

Moreover, sections I and III of article IX of our Constitution of 1790 provided:

> That the general, great, and essential principles of liberty and free Government may be recognized and unalterably established, WE DECLARE,

> ***Of the equality and rights of men.***

Section I. ***That all men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those*** of enjoying and defending life and liberty, of acquiring, possessing, and protecting property and reputation, and ***of pursuing their own happiness.***

\* \* \*

***Of the rights of conscience, &c.***
Sect. III. That all men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; that no man can, of right, be compelled to attend, erect, or support any place of worship, or to maintain any ministry against his consent; ***that no human authority can, in any case whatever, controul* [sic] *or interfere with the rights of conscience***; ***and that no preference shall ever be given, by law, to any religious establishments or modes of worship.***

Pa. Const. art. IX, §§1 and 3 (September 2, 1790) (emphasis added) (accessed at

https://www.paconstitution.org/wp-content/uploads/2017/11/const-1970-pa-

archives-vol10.pdf) (last visited April 17, 2026).

Furthermore, sections I and III of article IX of our Constitution of 1838

provided:

That the general, great, and essential principles of Liberty and Free Government may be recognized and unalterably established, WE DECLARE–

***Rights of life liberty property &c.***
Section I. ***All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those*** of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and ***of pursuing their own happiness***.

\* \* \*

MHW-15

***Rights of conscience &c.***
Section III.  All men have a natural and indefeasible right to worship Almighty God, according to the dictates of their own consciences; no man can, of right, be compelled to attend, erect, or support any place of worship, or to maintain any ministry against his consent; ***no human authority can, in any case whatever, control or interfere with the rights of conscience***; ***and no preference shall ever be given, by law, to any religious establishments or modes of worship***.

Pa. Const. art. IX, §§1 and 3 (October 22, 1838) (emphasis added) (accessed at https://www.paconstitution.org/texts-of-the-constitution/1838-2/) (last visited April 17, 2026).

In construing the foregoing provisions, the Pennsylvania Supreme Court described the contours of this constitutional protection thusly:

> ***The constitution of this state secures freedom of conscience and equality of religious right***.  No man, living under the protection of our institutions, can be coerced to profess any form of religious belief, or to practice any peculiar mode of worship, in preference to another.  ***In this respect, the Christian, the Jew, the Mohammedan, and the Pagan, are alike entitled to protection.  Nay, the Infidel, who madly rejects all belief in a Divine Essence, may safely do so, in reference to civil punishment, so long as he refrains from the wanton and malicious proclamation of his opinions with intent to outrage the moral and religious convictions of a community, the vast majority of whom are Christians***.  But beyond this, conscientious doctrines and practices can claim no immunity from the operation of general laws made for the government and to promote the welfare of the whole people.  ***In the language of Chief Justice Gibson, the right of conscience, as understood under our organic law, "is simply a right*** to worship the Supreme Being according to the dictates of the heart; ***to adopt any creed or hold any opinion whatever,*** or to support any religion; ***and to do, or forbear to do, any act for conscience' sake, the doing or forbearing of which is not prejudicial to the***

***public weal***” (*Commonwealth v. Lesher*, 17 S. & R. 160 [(1828)).]

*Specht v. Commonwealth*, 8 Pa. 312, 322-23 (1848) (emphasis added).

To this end, the amended provisions in sections I and III of article IX of our ratified Constitution of 1874 provided:

> DECLARATION OF RIGHTS
> That the general, great and essential principles of liberty and free government may be recognized and unalterably established, WE DECLARE THAT –
>
> ***Equality and rights of men***.
> Section 1.
>
> ***All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those*** of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and ***of pursuing their own happiness***.
>
> * * *
>
> ***Natural right of conscience and freedom of worship.***[9]

---

[9] *See also Allegheny Reproductive Health Center*, 309 A.3d at 980 (Wecht, J., concurring):

> Where the Establishment and Free Exercise Clauses of the First Amendment [to the United States Constitution] are tied to religion, [a]rticle I, [s]ection 3 expressly extends to the more sweeping realm of "conscience." One's freedom of conscience includes concepts of morals and ethics that lay beyond the structures of established religions. Article I, [s]ection 3 therefore exceeds the limitations of the First Amendment, in both breadth and emphasis. Construed broadly, [a]rticle I, [s]ection 3 may support arguments that freedom of conscience prevents the state from interfering in decisions that involve deeply held moral and ethical views, particularly when such decisions will have a profound effect on the individual's life. To the extent that convictions of conscience and religion inform personal views on reproductive choices, freedom of conscience may protect a woman's freedom to act in accord with her own moral and ethical views and to make her own decisions. [(Footnote omitted).]

MHW-17

Section 3.
All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; no man can of right be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent; *no human authority can, in any case whatever, control or interfere with the rights of conscience, and no preference shall ever be given by law to any religious establishments or modes of worship*.

Pa. Const. art. I, §§1 and 3 (December 16, 1873) (emphasis added) (accessed at https://www.paconstitution.org/texts-of-the-constitution/1874-2/) (last visited April 17, 2026).

Finally, and quite importantly, sections 1 and 3 of article I of our present Constitution provide:

§1. *Inherent rights of mankind*
*All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those* of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and *of pursuing their own happiness*.

\* \* \*

§3. Religious freedom
All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; no man can of right be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent; *no human authority can, in any case whatever, control or interfere with the rights of conscience*, *and no preference shall ever be given by law to any religious establishments or modes of worship.*

Pa. Const. art. I, §§1 and 3 (emphasis added).

As outlined above, the right of a competent individual to conduct one's affairs according to one's own conscience, in whatever form, is a fundamental right in Pennsylvania that is separate and apart from the rights of freedom of religion or

MHW-18

personal privacy,[10] while containing elements of both. Moreover, "right of conscience," "liberty of conscience," and "freedom of conscience" have been terms of art that have existed since this Commonwealth's inception in 1682. Stated simply, as it relates to the exercise of a woman's right to choose herein, I am convinced that this inherent right to act according to one's own conscience, or sincerely held system of beliefs, precludes the Commonwealth from constitutionally coercing a competent woman by statute to prevent her from receiving required medical care to end her pregnancy. Her constitutional "freedom of conscience," "liberty of conscience," and "right of conscience" has existed in this Commonwealth since Penn's *Charter of Privileges* was adopted in 1701.

Such a construction of William Penn's intent to provide for personal freedom, equality, and tolerance is evidenced by the Quakers' current policies on sexuality and abortion. Indeed, as explained by the Philadelphia Yearly Meeting:

> Friends seek to acknowledge and nurture sexuality as a divine gift that celebrates human love with joy and intimacy. In defining healthy sexuality, Friends are

---

[10] *See, e.g., In re Fortieth Statewide Investigating Grand Jury*, 190 A.3d 560, 572-73 (Pa. 2018), wherein our Supreme Court discussed Pennsylvania's additional distinct and fundamental constitutional right to protect one's reputation via due process, stating:

> [I]n Pennsylvania [the right of citizens to security in their reputations] is a fundamental constitutional entitlement. *See* Pa. Const. art. I, §1; *R. v.* [*Department of Public Welfare*, 636 A.2d 142, 149 (Pa. 1994)]. The right is established in the opening passage of the Pennsylvania Constitution's Declaration of Rights -- under the title "Inherent rights of mankind" -- and is couched as an "indefeasible" guarantee. Pa. Const. art. I, §1. This foundational assurance of reputational security has remained substantively extant through four iterations of the state charter, dating back to our Constitution of 1790.

*See also* n.6, *supra*.

MHW-19

guided by our testimonies: that sexual relationships are equal, not exploitative; that sexual behavior be marked by integrity; and that sex is an act of love, not aggression. Sexuality is at once an integral and an intricate part of personality. Understanding our own sexuality is an essential aspect of our journey toward wholeness. Learning to incorporate sexuality into our lives responsibly, joyfully and with integrity is a lifelong process beginning in childhood.

Friends are wary of a fixed moral code to govern sexual activity. The sacramental quality of the sexual relationship depends upon Spirit as well as on the motives of the persons concerned. With guidance from the Inward Teacher, we can examine relationships honestly, with the strength to reconcile often conflicting demands of body, heart, and mind. Precisely because our sexuality is so powerful, seeking the Divine becomes essential. The self-discipline and obedience to Spirit thus called is more personal, and perhaps more difficult, than adherence to an external code.

Friends approve the concept of family planning, including adoption. We are in unity about the value of human life, but not about abortion. We are urged to seek the guidance of the Spirit when dealing with an unexpected pregnancy and to support one another in avoiding situations that continue a need for abortion.

PHILADELPHIA YEARLY MEETING at 41-42.

Acknowledging the divergent views on this point among Quakers, and following an extended period of discernment, the Friends Committee on National Legislation (FCNL)[11] ultimately issued the following statement regarding its position on a woman's right to choose, stating:

---

[11] Since 1943, the FCNL has been a lobbying arm for the Quakers in Congress. As the FCNL has stated: "Governed by members of the Religious Society of Friends, FCNL acts in faith to create a world free from war, a society with equity and justice for all, a community where every person's potential may be fulfilled, and an earth restored." FCNL, THE WORLD WE SEEK: STATEMENT OF LEGISLATIVE POLICY P.I. (2024).

Quakers recognize that human life is sacred, and that Spirit can guide us individually and collectively. Based on these beliefs, members of the Religious Society of Friends have come to different conclusions regarding abortion. FCNL supports individual discernment in a spirit of love and truth in making reproductive healthcare decisions, as we do in other areas of conscientious moral choice. Government must ensure that people have the legal right to make these decisions. We oppose the criminalization of people seeking, undergoing, or involved in abortion services. We support equitable access to abortion services. FCNL also supports policies that reduce unwanted pregnancies by ensuring equitable access to contraception, sex education, family planning, fertility and adoption services, and support for all who decide to have children.

FCNL, THE WORLD WE SEEK: STATEMENT OF LEGISLATIVE POLICY §III.2.7. (2024).

This Quaker view of tolerance in practice is eloquently described in the testimony of a member of the Yearly Meeting in Britain, as follows:

However one views it, and for whatever reason it is carried out, an abortion is a deliberate taking of a potential life. The arguments around the right to life versus the right to choose do little to help those who believe in personal morality yet whose religion lays down no hard and fast rules about moral issues such as abortion.

As a nurse who was asked to become involved in the procedure of therapeutic abortion I was forced to decide. My final decision, made after much heart-searching, was to say 'No.' As a result I had to move to a less conveniently placed hospital, but my decision was accepted and at no time was my livelihood threatened.

The right of medical personnel to choose not to become involved in the procedure of therapeutic abortion is enshrined in law.[12] In my case I used my right to choose,

---

12 *See, e.g.*, Section 3202(d) of our Crimes Code, which states:

**(Footnote continued on next page…)**

MHW-21

but this left me with a dilemma.  Where should I stand on another's right to choose to have an abortion?  My choice was respected and my rights maintained.  My responsibility had to be to respect another's choice and maintain their right to my compassion and understanding.  To do less would make my decision nothing more than a pious declaration which ignored the very real pain suffered by many women who decide to have an abortion.

Pauline Condon, 1994

YEARLY MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS (QUAKERS) IN BRITAIN

(BRITISH YEARLY MEETING), QUAKER FAITH AND PRACTICE §22.57 (5th ed. 1994).

Finally, this Quaker view of tolerance is also described in the heartbreaking testimony of another member of the Yearly Meeting in Britain:

I once read in a feminist philosopher's work that only pacifists could logically be opposed to abortion since only they took an absolutist approach that it is always wrong to take life.  But what if you are both a pacifist and one who believes that women should have a right to make choices

---

**(d) Right of conscience.--**It is the further public policy of the Commonwealth of Pennsylvania to respect and protect the right of conscience of all persons who refuse to obtain, receive, subsidize, accept or provide abortions including those persons who are engaged in the delivery of medical services and medical care whether acting individually, corporately or in association with other persons; and to prohibit all forms of discrimination, disqualification, coercion, disability or imposition of liability or financial burden upon such persons or entities by reason of their refusing to act contrary to their conscience or conscientious convictions in refusing to obtain, receive, subsidize, accept or provide abortions.

18 Pa. C.S. §3202(d).  In turn, Section 3203 defines "conscience" as *"[a] sincerely held set of moral convictions* arising from belief in and relation to a deity or *which*, though not so derived, *obtains from a place in the life of its possessor parallel to that filled by a deity among adherents to religious faiths*." *Id.* at §3203 (emphasis added).  As explained above, the General Assembly's legislative authority to enact such a provision cannot be questioned. *City of Erie v. Erie Traction Co.*, 222 Pa. 43 (Pa. 1908); *City of Pittsburg v. Pittsburg, C. & W.R. Co.*, 205 Pa. 13 (Pa. 1903); *Cronise v. Cronise*, 54 Pa. 255 (Pa. 1867).

MHW-22

about their own lives?  Since we live in a society that both expects women to take responsibility for children and yet provides little financial or emotional support, how can we insist that a young woman take on the burden of an unwanted child, or even the physical and emotional stress of bearing a child for adoption?

These could have remained theoretical questions.  But life is not like that.  A member of my family became pregnant and a decision had to be made quickly, within twenty-four hours.  A baby was not intended, neither of the young people concerned had financial resources, a child would affect the establishment of at least one, if not two careers.  I was the sole financial support of the family, so that I too could not care for a child.

It was clear to me then, it was clear to all of us, that an early abortion was the right answer.  That does not mean that abortion itself is right, but that when human beings get into situations where every choice is wrong, then courageous and responsible decisions have to be made, and the consequences lived with.

I am still sure that in the circumstances the right choice was made.  It was made by the person who had to live with the consequences, and it was made with family support.  In a sense, an unborn child carried for all of us the costs of being a broken family in a broken world.  But when I see and hold other peoples' babies, there is in my heart a grief which I cannot share, since it is not my secret, for the grandchild I never had and shall never know.

Anonymous, 1990

BRITISH YEARLY MEETING at §22.55.

As outlined above, when William Penn and the Assembly granted a "right of conscience" in the *Charter of Privileges*, they did so in stark contrast to the other theocentric colonies in America.  Where those colonies' legal codes were imbued with specific religious dogma, Pennsylvania's own *Charter of Privileges*

was based on the more general "liberty of conscience.[13]"  As a result, since the ratification of our *Charter of Privileges* in 1701, each and every Pennsylvania Constitution has included an expressly enumerated "right of conscience," which

---

[13] As a former Justice of the Rhode Island Supreme Court recounted long ago:

> Coming into power, th[e Puritans] established their own church, and compelled an unwilling people to conform to and support it.  The Quakers probed deeper.  They rebelled against prelate and presbyter alike.  **They claimed not toleration, but liberty of conscience for all as an inalienable right**; they demanded the absolute Separation of Church and State, denounced the clergy as priests and hirelings, and . . . refused to acknowledge their authority or to contribute so much as a farthing to their maintenance.  Silent meditation, only interrupted by a short prayer or exhortation by one or more of them, who, perchance, were moved by the Spirit, constituted their only form of worship.  They substituted simple affirmation for the oath, defending the innovation with apt and telling quotes from scripture.  They held meetings for worship, and were generally careful to abstain from all unnecessary secular employment on the first day of the week, but they did not regard it especially as the "Lord's Day."  They claimed that all days are alike holy in the sight of God.  They regarded the use of plural number in addressing one person as a species of flattery, and adopted the simple *thee* and *thou* of the Bible.  They addressed all men by the Christian names only, regarding all other modes of address as "flattering titles."  They declared that it is not lawful for Christians to kneel or prostrate themselves to any man, or to bow the body, or to uncover the head to men; that it is not lawful for Christians to use superfluities in apparel, as are of no use save for ornament or vanity; that it is not lawful to use games, sports, plays, nor, among other things, comedies, among Christians, under the notion of recreations, which do not agree with Christian silence, gravity, and sobriety.  They considered war an evil, as opposite and contrary to the spirit and doctrine of Christ as light to darkness, and they would not fight.

HORATIO ROGERS, MARY DYER OF RHODE ISLAND: THE QUAKER MARTYR THAT WAS HANGED ON BOSTON COMMON JUNE 1, 1660, VOL. I, 24-26 (Norwood Press 1896) (emphasis added) (accessed at https://www.google.com/books/edition/_/ArMDAAAAYAAJ?hl=en&gbpv=1) (last visited April 17, 2026).

extends beyond that of religious practice and bleeds into the remainder of our civil legal code.[14]

In fact, it might be more accurately said that the right of a competent individual to conduct one's affairs according to one's own conscience, in whatever form, is a fundamental right in Pennsylvania that is separate and apart from the rights of freedom of religion, equality, or personal privacy, while containing elements of all. As it relates to the exercise of a woman's right to choose, then, this inherent right to act according to one's own conscience, or sincerely held system of beliefs, in the pursuit of happiness[15] prohibits the Commonwealth from constitutionally

---

[14] *See, e.g.*, *Wikoskie v. Wikoskie*, 513 A.2d 986, 989 (Pa. Super. 1986), wherein the Pennsylvania Superior Court held:

> The state's interests in regulating marriage and divorce are clearly paramount. That regulation is inconsistent with the recognition of a unilateral right of a party to remove himself from its purview as a matter of conscience. The state has the power, properly exercised within constitutional limits guaranteeing freedom of religion, to grant divorces. Thus, whether granting [the wife] her divorce is viewed as not infringing upon [the husband's] freedom of religion, as in *Williams* [*v. William*, 543 P.2d 1401 (Oklahoma 1975)], or as interfering with the practice of his religion, as in *Reynolds* [*v. United States*, 98 U.S. 145 (1878)], the result reached here would be the same. To whatever extent the issuance of a divorce decree interferes with the practice of [the husband's] religion, it does not violate an individual's right to freedom of conscience.

*See also Wertz v. Chapman Township*, 709 A.2d 428, 433 n.8 (Pa. Cmwlth. 1998) ("This [C]ourt is not bound by the Superior Court's precedents although, where persuasive, we are free to adopt the Superior Court's reasoning.") (citations omitted).

[15] Although this is an enumerated right that is included in article I, section 1 of our Constitution and in the Declaration of Independence, like the inherent rights of reputation and conscience and our ERA, there is no federal counterpart in the United States Constitution. *See, e.g., Reed v. Department of Transportation*, 872 A.2d 202, 205 (Pa. Cmwlth. 2005) ("[W]hile the Preamble to the Declaration of Independence does mention 'the pursuit of happiness,' nowhere in **(Footnote continued on next page…)**

bending the moral will of a competent woman by statute to prevent her from receiving required medical care to end her pregnancy.[16]

It is truly distressing that in Pennsylvania today a Quaker patient is still subjected to provisions of law discouraging her, or even precluding her, from obtaining fully informed and necessary medical treatment that conforms to the tenets of her faith.[17]  No, rather, I firmly believe that a patient's unencumbered "freedom of conscience," "liberty of conscience," "right of conscience" or, in this case, "right to choose," has been protected under the Constitution of this Commonwealth since 1701, long before the American Revolution.[18]

_____

the [federal] Constitution does the government guarantee a citizen the right to his own idiosyncratic vision of happiness which in this case, is having his driver's license photo taken with his eyes closed.").

[16] *See* ROGERS at 67-68 ("Each must judge for himself of the credit due to Mary Dyer for her sufferings and death.  It is a growing belief that when, in coming ages, the roll shall be made up of those whose lives or deaths contributed to the establishment among men of the immortal principle of liberty of conscience, inscribed in enduring fame upon it will be found the name of Mary Dyer.").

[17] *See also Allegheny Reproductive Health Center*, 309 A.3d at 892 n.86, wherein our Supreme Court noted:

> A similar position is raised by a number of faith-based organizations that include the National Council of Jewish Women and Catholics for Choice, who argue that this Court has long held that Pennsylvania's Constitution guarantees a robust right to privacy that surpasses the right recognized by federal law.  They detail the varied and nuanced positions held by, and within, the Jewish, Catholic and Islamic faiths regarding when life begins and contend that at least some segments of practitioners of those faiths, and others, believe that abortion is moral and permissible and can be reconciled with their religious beliefs.

[18] I find the Dissenting Opinion's "response," more akin to a gratuitous attack, unpersuasive. *See, e.g., Braun v. Vote.org*, 11 N.W.3d 106, 115 n.9 (Wis. Ct. App.), *appeal denied*,
**(Footnote continued on next page…)**

MHW-26

As initially stated above, I fully join in the Majority's rationale in its disposition of this matter pursuant to our Supreme Court's remand instructions in *Allegheny Reproductive Health Center* and Pa.R.A.P. 2591(a). I merely provide the foregoing Concurring Opinion in further support of the Majority Opinion granting Petitioners summary relief.

_____

MICHAEL H. WOJCIK, Judge

President Judge Cohn Jubelirer joins in this Concurring Opinion.

---

15 N.W.3d 767 (Wis. 2024) ("In refusing to simply apply the well-established law governing intervention and acknowledge that the [two organizations] share the same interest, the Dissent evokes the well-known Shakespearean maxim of 'protesting too much.' *See* William Shakespeare, *Hamlet* act 3, sc. 2[, ln. 242] ('The lady doth protest too much, methinks.'). Methinks."). Instead, I am reminded of the eloquent and important words of the late Justice Musmanno:

> The greatest joy that can be experienced by mortal man is to feel himself master of his fate,—this in small as well as in big things. Of all the precious privileges and prerogatives in the crown of happiness which every American citizen has the right to wear, none shines with greater luster and imparts more innate satisfaction and soulful contentment to the wearer than the golden, diamond-studded right to be let alone. Everything else in comparison is dross and sawdust.

*Commonwealth v. Murray*, 223 A.2d 102, 110 (Pa. 1966) (Musmanno, J., dissenting).

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Allegheny Reproductive Health Center, :
Allentown Women's Center, Delaware :
County Women's Center, Philadelphia :
Women's Center, Planned Parenthood :
Keystone, Planned Parenthood :
Southeastern Pennsylvania, and Planned :
Parenthood of Western Pennsylvania, :
        Petitioners :
            :
      v.      :   No. 26 M.D. 2019
            :
Pennsylvania Department of Human :   Argued: November 5, 2025
Services, Teresa Miller, in her official :
capacity as Secretary of the :
Pennsylvania Department of Human :
Services, Leesa Allen, in her official :
capacity as Executive Deputy Secretary :
for the Pennsylvania Department of :
Human Service's Office of Medical :
Assistance Programs, and Sally Kozak, :
in her official capacity as Deputy :
Secretary for the Pennsylvania :
Department of Human Service's :
Office of Medical Assistance Programs, :
        Respondents :

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
      HONORABLE PATRICIA A. McCULLOUGH, Judge
      HONORABLE ANNE E. COVEY, Judge
      HONORABLE MICHAEL H. WOJCIK, Judge
      HONORABLE LORI A. DUMAS, Judge
      HONORABLE STACY WALLACE, Judge
      HONORABLE MATTHEW S. WOLF, Judge

DISSENTING OPINION
BY JUDGE McCULLOUGH         FILED: April 20, 2026

    Today the four-member Majority declares that the corporate petitioners, four of which operate for profit (Abortion Providers), have a constitutionally-mandated ability to bill Pennsylvania taxpayers to pay for abortions-

on-demand sought by Medical Assistance recipients. What is more, however, is that the Majority got where it wanted without a hearing, without factfinding, without even an answer to Abortion Providers' Petition for Review. The Majority's decision is based entirely on unvetted "stipulations" submitted jointly by Abortion Providers and Respondents *after* Respondents abandoned any defense of the constitutionality of the abortion funding restrictions challenged in this litigation. Even after the Attorney General intervened on behalf of the Commonwealth to defend those restrictions and requested a hearing at which to do so, the Majority dispensed with a hearing and factfinding, and now grants summary relief by judicial fiat.

To impose this funding burden onto taxpayers, the Majority summarily re-writes longstanding Pennsylvania public policy favoring the protection of the life of an unborn child, a policy that remains enshrined in statutes and constitutional provisions enacted neither by the Majority nor by any court, but by the People. The Majority also creates a fundamental but nebulous constitutional right to "reproductive autonomy," inserts it into the 152-year-old article I, section 1 of the Pennsylvania Constitution, and then mandates that Pennsylvania taxpayers fund its exercise to include abortions sought by Medical Assistance recipients.

I simply cannot recall another case in which this Court has decided issues of such profound public importance in this kind of summary, we-believe-you-if-you-say-so fashion that does anything but give "full notice to the bench, bar, and public." *Allegheny Reproductive Center v. Pennsylvania Department of Human Services*, 309 A.3d 808, 998 (Pa. 2024) (Dougherty, J., concurring and dissenting). Because the Majority's decision is premature and unsupported in fact or law, I respectfully, but adamantly, dissent.

### I. The Majority errs by granting summary relief in favor of Abortion Providers without a hearing or factfinding.

#### A. Procedural History

I do not fundamentally disagree with the Majority's recitation of the procedural history of this case, including its summary of the prior dispositions of this Court in *Allegheny Reproductive Health Center v. Pennsylvania Department of Human Services*, 225 A.3d 902 (Pa. Cmwlth. 2020) (*AR I*), and *Allegheny Reproductive Health Center v. Pennsylvania Department of Human Services*, 249 A.3d 598 (Pa. Cmwlth. 2021) (*en banc*) (*AR II*), both of which were reversed by the Pennsylvania Supreme Court in *Allegheny Reproductive Health Center v. Pennsylvania Department of Human Services*, 309 A.3d 808 (Pa. 2024) (*Allegheny Reproductive III*) (*AR III*). Nor do I disagree with the Majority's summary of Abortion Providers' Petition for Review and the relevant provisions of the Abortion Control Act[1] (ACA) challenged therein. Nevertheless, there are gaps in the Majority's narrative, and I begin by filling those in.

The ACA took effect in 1982.[2] In Section 3202 of the ACA, the General Assembly set forth explicitly the Pennsylvania public policies supporting its enactment. Because the Majority does not cite or reference them, I include them here in full:

> (a) Rights and interests.--**It is the intention of the General Assembly of the Commonwealth of Pennsylvania to protect hereby the life and health of the woman subject to abortion and to protect the life**

---

[1] 18 Pa.C.S. §§ 3201-3220.

[2] The ACA passed in the General Assembly by a vote of 157-80 (30-19 in the Senate and 127-61 in the House). *See* https://www.palegis.us/legislation/bills/1981/sb439 (last visited April 20, 2026).

**and health of the child**[3] **subject to abortion.** It is the further intention of the General Assembly to foster the development of standards of professional conduct in a critical area of medical practice, to provide for development of statistical data and to protect the right of the minor woman voluntarily to decide to submit to abortion or to carry her child to term. **The General Assembly finds as fact that the rights and interests furthered by this chapter are not secure in the context in which abortion is presently performed.**

(b) Conclusions.--**Reliable and convincing evidence** has compelled the General Assembly to conclude and the General Assembly does hereby solemnly declare and find that:

(1) Many women now seek or are encouraged to undergo abortions without full knowledge of the development of the unborn child or of alternatives to abortion.

(2) The gestational age at which viability of an unborn child occurs has been lowering substantially and steadily as advances in neonatal medical care continue to be made.

(3) A significant number of late-term abortions result in live births, or in delivery of children who could survive if measures were taken to bring about breathing. Some physicians have been allowing these children to die or have been failing to induce breathing.

**(4) Because the Commonwealth places a supreme value upon protecting human life, it is necessary that those physicians which it permits to practice medicine be held to precise standards of care in cases where their actions do or may result in the death of an unborn child.**

---

[3] The ACA defines "unborn child" and "fetus" synonymously as "an individual organism of the species homo sapiens from fertilization until live birth." 18 Pa.C.S. § 3203. In other words, the ACA views a fetus as an unborn child from fertilization to delivery.

(5) A reasonable waiting period, as contained in this chapter, is critical to the assurance that a woman elect to undergo an abortion procedure only after having the fullest opportunity to give her informed consent thereto.

(c) Construction.--In every relevant civil or criminal proceeding in which it is possible to do so without violating the Federal Constitution, **the common and statutory law of Pennsylvania shall be construed so as to extend to the unborn the equal protection of the laws and to further the public policy of this Commonwealth encouraging childbirth over abortion.**[4]

(d) Right of conscience.--It is the further public policy of the Commonwealth of Pennsylvania to respect and protect the right of conscience of all persons who refuse to obtain, receive, subsidize, accept or provide abortions including those persons who are engaged in the delivery of medical services and medical care whether acting individually, corporately or in association with other persons; and to prohibit all forms of discrimination, disqualification, coercion, disability or imposition of liability or financial burden upon such persons or entities by reason of their refusing to act contrary to their conscience or conscientious convictions in refusing to obtain, receive, subsidize, accept or provide abortions.

18 Pa.C.S. § 3202(a)-(d) (emphasis provided). Thus, the ACA considers abortion to be a procedure that ends an unborn child's life, upon which this Commonwealth places supreme value. The ACA also mandates that courts, agencies, and any other tribunals, construe where relevant all Pennsylvania law, in all proceedings,

---

[4] Given the United States Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 225-27 (2022), the federal constitution poses no barrier to construing Pennsylvania law in a way that furthers the express Pennsylvania public policy of encouraging childbirth over abortion.

consistently with the Pennsylvania public policies (1) guaranteeing unborn children the equal protection of the laws and (2) favoring unborn child life over unborn child death. As to Pennsylvania citizens' rights of conscience,[5] the ACA recognizes and protects their right to be free from coerced subsidization of a practice many consider to be morally and ethically wrong. It nevertheless leaves Pennsylvania citizens free to contribute voluntarily to causes or organizations (such as Abortion Providers) who support or perform abortions.

The ACA further imposes certain limitations and conditions on seeking an abortion, including that it be "necessary" as determined by a physician, *Id.* § 3204(a); that it be performed with the woman's "informed consent," *Id.* § 3205(a); that minors under the age of 18 and incapacitated persons must obtain the consent of at least one parent or guardian, *Id.* § 3206; that, with certain exceptions, married women must first attest that they have notified their spouse of their intent to seek an abortion, *Id.* § 3209(a); and that, with certain exceptions, abortions may not be performed on unborn children older than 24 weeks. *Id.* § 3211(a), (b).

In this suit, Abortion Providers challenge Subsections 3215(c) and (j) of the ACA (the Coverage Exclusion), arguing that they violate various provisions of the Pennsylvania Constitution. Section 3215 provides in pertinent part, as follows:

> **(c) Public funds.**--No Commonwealth funds and no Federal funds which are appropriated by the Commonwealth shall be expended by any State or local government agency for the performance of abortion, except:

---

[5] *See* Pa. Const. art. I, § 3 (providing, in part, that "no human authority can, in any case whatever, control or interfere with the rights of conscience").

(1) When abortion is necessary to avert the death of the mother on certification by a physician. When such physician will perform the abortion or has a pecuniary or proprietary interest in the abortion there shall be a separate certification from a physician who has no such interest.

(2) When abortion is performed in the case of pregnancy caused by rape which, prior to the performance of the abortion, has been reported, together with the identity of the offender, if known, to a law enforcement agency having the requisite jurisdiction and has been personally reported by the victim.

(3) When abortion is performed in the case of pregnancy caused by incest which, prior to the performance of the abortion, has been personally reported by the victim to a law enforcement agency having the requisite jurisdiction, or, in the case of a minor, to the county child protective service agency and the other party to the incestuous act has been named in such report.

. . . .

**(j) Required statements.**--No Commonwealth agency shall make any payment from Federal or State funds appropriated by the Commonwealth for the performance of any abortion pursuant to subsection (c)(2) or (3) unless the Commonwealth agency first:

(1) receives from the physician or facility seeking payment a statement signed by the physician performing the abortion stating that, prior to performing the abortion, he obtained a non-notarized, signed statement from the pregnant woman stating that she was a victim of rape or incest, as the case may be, and that she reported the crime, including the identity of the offender, if known, to a law enforcement agency having the requisite jurisdiction or, in the case of incest where a pregnant minor is the victim, to the county child protective service agency and stating the name of

PAM - 7

the law enforcement agency or child protective service agency to which the report was made and the date such report was made;

(2) receives from the physician or facility seeking payment, the signed statement of the pregnant woman which is described in paragraph (1). The statement shall bear the notice that any false statements made therein are punishable by law and shall state that the pregnant woman is aware that false reports to law enforcement authorities are punishable by law; and

(3) verifies with the law enforcement agency or child protective service agency named in the statement of the pregnant woman whether a report of rape or incest was filed with the agency in accordance with the statement.

18 Pa.C.S. § 3215(c), (j).

Under the Medicaid or Medical Assistance program, federal funds are distributed to states for use in providing certain medical or dental services to the elderly, indigent, and disabled. *See* 42 U.S.C. § 1396-1. Federal law prohibits the use of federal funds distributed under the Medicaid program to pay for abortions except when the patient's life is threatened or in cases of rape or incest. *See, e.g.,* 42 C.F.R. §§ 441.202, 441.203; 42 C.F.R. § 457.475(a), (b). Nevertheless, federal law does not preclude states from utilizing state-sourced funds to pay for abortions. The Coverage Exclusion's salient function, then, is to prohibit, with the three enumerated exceptions, payment for abortions with funds sourced exclusively from Pennsylvania taxpayers. To this prohibition Abortion Providers object, arguing it is an unconstitutional sex-based classification[6] and an unconstitutional, discriminatory burden on the exercise of their fundamental right to reproductive autonomy.

---

[6] *See* Pa. Const. art. I, § 28 (the Equal Rights Amendment, or ERA).

In *AR II*, this Court dismissed Abortion Providers' claims as required by the unanimous, seven-Justice Pennsylvania Supreme Court decision in *Fischer v. Department of Public Welfare*, 502 A.2d 114 (Pa. 1985). Then, in *AR III*, a three-Justice majority of the Pennsylvania Supreme Court (the *AR III* Majority) overruled *Fischer*[7] and reversed this Court's decisions in *AR I*[8] *and AR II*. *AR III*, 309 A.3d at 947. First, and following in principle the lead of the Supreme Court of New Mexico, the *AR III* Majority concluded that, because the Coverage Exclusion precludes public funding for abortions for indigent women but does not similarly restrict funding for similar healthcare for men, it is sex-based and presumptively unconstitutional under the ERA. *Id.* at 891. Because it held the Coverage Exclusion to be presumptively unconstitutional, the Majority further mandated that it be reviewed under strict scrutiny; in other words, the Commonwealth would bear the burden on remand to rebut the presumption of unconstitutionality with evidence establishing (1) a compelling state interest furthered by the Coverage Exclusion, and (2) that no less intrusive methods exist to further that interest. *Id*.

---

[7] Two notable points about *Fischer* before I leave it. First, the petitioners in *Fischer* included actual people who claimed to be harmed by the Coverage Exclusion, including a taxpayer and "several [M]edical [A]ssistance recipients who, at the time the law suit was filed, were pregnant and desired abortions[.]" *Fischer*, 502 A.2d at 116 n.2. Here, there are only corporate petitioners, who complain that the Coverage Exclusion deprives them of access to taxpayer funding for abortions that they now must subsidize privately. Abortion Providers would rather spend their money more strategically, which taxpayer funding will permit. (Majority Op., at 6.)

Second, although the parties in *Fischer* filed a stipulation of *uncontested* facts, a judge of this Court, fulfilling our duty to actually hear cases filed in our original jurisdiction, sat as chancellor and received two days of additional testimony before issuing an adjudication. *Fischer*, 502 A.2d at 117.

[8] In *AR I*, this Court granted the applications for leave to intervene filed by several members of both the Pennsylvania State Senate and Pennsylvania House of Representatives who sought to defend the constitutionality of the Coverage Exclusion. 225 A.3d at 914. The Supreme Court in *AR III* reversed that ruling and precluded the legislators' intervention. *AR III*, 309 A.3d at 849.

The *AR III* Majority expressly rejected the notion that it had ruled the Coverage Exclusion unconstitutional: "As a result of this decision, [Abortion] Providers' claim that the Coverage Exclusion violates the [ERA] will be adjudicated in the Commonwealth Court where we are confident there will be zealous advocacy supporting the state interests in the sex-based distinction." *Id.* at 891 n.83; *see also id.* at 947 ("This appeal does not resolve the ultimate issues challenging the constitutionality of the Coverage Exclusion under the Pennsylvania Constitution.")

As to Abortion Providers' equal protection claim under article I, sections 1 and 26 and article III, section 32 of the Pennsylvania Constitution,[9] the *AR III* Majority did not conclude that the Coverage Exclusion was presumptively unconstitutional. Rather, only two Justices of the *AR III* Majority (the *AR III* Plurality) would find a fundamental right to reproductive autonomy contained in the Pennsylvania Constitution and remand for this Court to apply, under article I, section 26, strict scrutiny to the Coverage Exclusion's "partiality towards carrying a pregnancy to term." *Id.* at 945-46. The *AR III* Majority did, however, establish the general framework for analyzing claims under article I, section 26, determining that,

> when a court is presented with a legislative classification that touches on the exercise of a civil right and it is being challenged on the basis that it is discriminatory, the court shall determine whether the classification operates neutrally with regard to the exercise of that right. If it does not, the court shall then conduct a commensurate means-ends review.

---

[9] It appears that Abortion Providers have abandoned any challenge to the Coverage Exclusion under article III, section 32 of the Pennsylvania Constitution, and the Majority does not discuss it. *See* Pa. Const. art. III, § 32 (prohibiting, among other things, the passing of local or special laws where general laws would suffice). In any event, article III, section 32 is, on its face, irrelevant. *See AR III*, 309 A.3d at 1003 (Mundy, J., concurring and dissenting).

*Id.* at 945. The *AR III* Majority then remanded for further proceedings. *Id.* at 947.

After remand, Respondents, who originally opposed Abortion Providers' claims, notified this Court that they would abandon any defense of the Coverage Exclusion and, instead, submit a brief explaining why Abortion Providers were entitled to judgment as a matter of law. (Notice, 7/16/2024, at 2-5.) Then, on July 19, 2024, Abortion Providers filed an Application for Summary Relief (Application), a supporting brief, and a 67-paragraph Joint Statement of Undisputed Facts (Stipulations). The Stipulations expectedly include basic details of Abortion Providers' businesses, *see* Stipulations, ¶¶ 1-20, details about Respondents, *Id.* ¶¶ 11-14, and a summary of the Medicaid and Medical Assistance programs and the Coverage Exclusion, *Id.* ¶¶ 15-25.

The Stipulations go on, however, to include agreements to otherwise disputed facts, conclusions of law, and social policy objectives. For example, the Stipulations purport to agree (1) to the harms the Coverage Exclusion allegedly imposes on Medical Assistance recipients, citing to multiple "expert" testimonial declarations that are replete with unvetted statistics, *Id.* ¶¶ 32-42; (2) that there are "less intrusive ways to promote healthy pregnancies and advance fetal and maternal health," *Id.* ¶ 43; and that (3) the Coverage Exclusion forces women to carry their pregnancies to term against their will, *Id.* ¶ 42. The Stipulations next include an agreement that:

> The [Coverage Exclusion] eliminates coverage of an extremely common  medical service for women that is linked to their reproductive capacity.  Historically, women's capacity for pregnancy has been at the root of their discriminatory treatment.  Denying women the ability to control their reproduction arises from and perpetuates traditional gender-based stereotypes about women's proper role in society. Specifically, covering the

medical costs of pregnancy and childbirth, but not abortion, coerces pregnant people to adhere to the gender-based stereotype that a woman's primary roles are mother and caregiver. And by failing to cover abortion, the coverage ban perpetuates gender inequality in the state of Pennsylvania by harming women's ability to participate equally in civic life, protect their health, and achieve financial security. Again, this harm falls disproportionately on Black women and other women of color.

Stipulations, ¶ 44 (citation omitted in original). The Stipulations also agree to the "Harm to Women Who Are Forced to Carry Their Pregnancies to Term," such as (1) denying women "reproductive autonomy" and dignity, control over their future plans, and equal participation in society; (2) placing at risk women's ability to participate as equals in society; (3) risking psychological and physical harm to women; and (4) increasing the likelihood of domestic abuse. *Id.* ¶¶ 45-57. *See also* Stipulations, ¶¶ 58-64 ("Harm to Women Who Are Able to Obtain an Abortion Despite the Coverage Ban"); ¶¶ 65-67 (agreeing that abortion is healthcare that is denied to women but granted to men for "similar" procedures, like vasectomies).

After several *amici curiae* filed briefs opposing Abortion Providers' Application and disputing the veracity of the Stipulations, Respondents filed their brief in support of the Application on October 25, 2024. The Court scheduled the Application for oral argument *en banc* on February 5, 2025, at which counsel for *Amici Curiae* Republican House Leader Bryan D. Cutler and Republican House Appropriations Chair Seth M. Grove appeared, with leave, to argue against our granting the Application. *See* Order, 1/16/2025. We thereafter granted the Commonwealth, by the Office of Attorney General (Commonwealth), leave to intervene to defend the Coverage Exclusion and scheduled the Application for a second oral argument *en banc*.

In its brief opposing the Application, the Commonwealth argues that the Coverage Exclusion does not violate any provision(s) of the Pennsylvania Constitution because the Coverage Exclusion survives strict scrutiny analysis and because the constitution contains no fundamental right to reproductive autonomy. In support, the Commonwealth asserts three discrete state interests that it contends are compelling: (1) protecting the life of an unborn child, (2) protecting women's health, and (3) respecting the conscience rights of those Pennsylvania taxpayers who object to abortion. (Commonwealth Br. at 15-22.) The Commonwealth also argues that the Coverage Exclusion is narrowly tailored to further these interests and that the disputed issues of fact in this case must be decided after a hearing. *Id.* at 19-20, 22-28, 63-64, 65. At oral argument in November 2025, Counsel for the Commonwealth disclaimed agreement with many of the factual, legal, and policy assertions contained in the Stipulations and reiterated the need for this Court to afford the Commonwealth the opportunity to make its case at a hearing.

### B. The Majority errs in dispensing with a hearing and factfinding and, therein, denies the Commonwealth the right to make its case.

Given its status as a party, the directive of the Supreme Court on remand, and the factual disputes in this case, the Commonwealth has the right to rebut the presumption of unconstitutionality with evidence at a hearing. Moreover, this Court has the duty to decide cases filed in our original jurisdiction based on a developed factual record and factfinding. The Majority has short-circuited that process here, granting summary relief while, as I discuss below, material factual disputes remain outstanding.

This is particularly true because the Stipulations do not, by themselves, entitle Abortion Providers to summary relief. Pursuant to Pennsylvania Rule of

PAM - 13

Appellate Procedure 1532(b), this Court will grant summary relief only where a moving party establishes that their right to relief is clear and that no material facts are disputed. Pa.R.A.P. 1532(b); *Commonwealth by & through Krasner v. Attorney General*, 309 A.3d 265, 270 n.6 (Pa. Cmwlth. 2024). A fact is "material" if it "could affect the outcome of the case under the governing law." *Strine v. Commonwealth*, 894 A.2d 733, 738 (Pa. 2006). An application for summary relief is evaluated by the standards governing summary judgment, which require the record to be viewed in a light most favorable to the nonmoving party. *Meyers v. Commonwealth*, 128 A.3d 846, 849 (Pa. Cmwlth. 2015); *Meggett v. Pennsylvania Department of Corrections*, 892 A.2d 872, 877 (Pa. Cmwlth. 2006).

The record we review in deciding an application for summary relief includes depositions, affidavits, answers to interrogatories, pleadings, and reports by expert witnesses. *Borough of Bedford v. Department of Environmental Protection*, 972 A.2d 53, 60 n.6 (Pa. Cmwlth. 2009). Moreover, under the rule first announced in *Borough of Nanty-Glo v. American Surety Co. of New York*, 163 A. 523 (Pa. 1932), "[h]owever clear and indisputable may be the proof when it depends upon oral testimony, it is nevertheless the province of the [factfinder] to decide . . . as to the law applicable to the facts." *Id.* at 524 (internal quotation marks and citation omitted); *see also Woodford v. Insurance Department*, 243 A.3d 60, 70 (Pa. 2020) (citing *Nanty-Glo* for the proposition that issues of credibility are for the factfinder, and summary judgment was not appropriate where the only evidence in support was oral testimony); *Krentz v. Consolidated Rail Corp.*, 910 A.2d 20, 37 (Pa. 2006) (a summary judgment movant must rely on something more than oral testimony because the decision whether to credit such testimony must be made by the factfinder); *Sanchez-Guardiola v. City of Philadelphia*, 87 A.3d 934, 938 (Pa.

Cmwlth. 2014) ("The 'Nanty-Glo rule' essentially means that the testimonial affidavits or depositions of the moving party's witnesses are insufficient by themselves to establish a material fact because the credibility of the testimony is still a matter for the jury[.]") (internal citations and quotation marks omitted). As our Supreme Court has noted, "[t]he function of the summary judgment proceedings is to avoid a useless trial but is not, and cannot, be used to provide for trial by affidavits or trial by depositions." *Penn Center House, Inc. v. Hoffman*, 553 A.2d 900, 902 (Pa. 1989) (internal quotation marks and citation omitted).

As to stipulations, "[a] stipulation is a declaration that the fact agreed upon is proven, and a valid stipulation must be enforced according to its terms. Therefore, for a stipulation to be enforceable it must be valid." *Commonwealth v. Perrin*, 291 A.3d 337, 345 (Pa. 2023). Generally speaking, parties to a case may file stipulations and be bound by them as the law or facts of the case with regard to all matters *affecting them*. *Id.*; *George A. Fuller Co., Inc. v. City of Pittsburgh*, 327 A.2d 191, 194 (Pa. 1974). However, parties may not stipulate in a fashion that affects the jurisdiction or prerogatives of the court, which includes a stipulation to the invalidity of statutes or ordinances. *George A. Fuller Co.*, 327 A.2d at 194. Courts disregard such stipulations because they involve "matters of public interest transcending the rights of the litigants involved." *Id.* (citation and quotations omitted). "[C]ourts should generally willingly consider factual stipulations proposed by the parties[,] but courts nevertheless "retain an important role in overseeing the administration of the judicial process and cannot be relegated to a mere rubber stamp for the parties." *Perrin*, 291 A.3d at 334-35. In that vein, parties may not stipulate to issues of witness credibility in an attempt to bind a court, as witness credibility is a matter within the sole province of the factfinder, who may

believe all, part, or none of the evidence. *Id.* at 345. Nor may parties stipulate to matters affecting the public interest in an attempt to control the court's disposition. *Id. See also* 83 C.J.S. Stipulations § 53 (2025) ("Parties cannot by stipulation affect any rights but their own. . . . [T]here is no binding effect on parties to the action who do not join in the stipulation, especially when the rights of those not made parties involve a matter of public interest."); 73 Am Jur. 2d Stipulations § 8 (2025) ("Parties to an action may not by stipulation affect third parties' rights or the rights of those not party to the stipulation."; "One who becomes a party to an action after the making of a stipulation is not bound thereby[.]").

Here, it is clear that the Stipulations cannot support summary relief, and the Majority erred in relying on them. The Stipulations were entered by non-adversarial parties and are saturated with agreements to conclusions of law, statements of Pennsylvania public policy, and citations to multiple "expert" testimonial declarations about disputed facts. The parties cannot bind this Court on questions of law, they certainly cannot stipulate to public policy, and the testimonial declarations, even if uncontroverted, do not bind this Court, which may reject them *in toto* if they are noncredible. This is true particularly given the significance of the public interests involved in this case and the fact that the disputing party is the Commonwealth itself, which is entitled to present evidence.

Thus, and most fundamentally, granting summary relief on Abortion Providers' claims without a hearing, without a record, and without any factfinding by this Court is a serious and injudicious error by the Majority. I would correct it before reaching any of the issues on the merits, and this alone is sufficient to deny summary relief.

## II.    Abortion Providers' Claims Fail in Any Event

### A.    The Coverage Exclusion is Narrowly Tailored to Further Three Compelling State Interests

To the extent that I can analyze Abortion Providers' claims without a record, they still fail. As to their claim under the ERA, the Majority begins where it must under *AR III* with a presumption that the Coverage Exclusion is an unconstitutional sex-based distinction to be independently analyzed by this Court under strict scrutiny review. (Majority Op. at 23-24.) What follows next is the Majority's three-pages-long "searching" judicial inquiry, *see AR III*, 309 A.3d at 891, which contains precisely two citations. The Majority first indicates that it will not "defer" to "legislative policy judgments." (Majority Op. at 24.) It then concludes that none of the interests identified by the Commonwealth are compelling, analyzing each interest in parallel fashion: pinning together a straw man and setting out on a scarecrow hunt.

First, the Majority criticizes the Commonwealth for too narrowly construing the interest in "fetal life" to include only "already-existing fetuses" and excluding the interests in "promoting human reproduction" and "preventing unplanned pregnancy." (Majority Op. at 24.) The Majority here makes the same mistake that Abortion Providers have made throughout this litigation: identifying the interests at stake in terms of birth control, which has nothing to do with this case. The only interest asserted by the Commonwealth and identified by the General Assembly to support the Coverage Exclusion is the interest in unborn child life *already conceived*, which, I believe, is compelling on its face. Averting unwanted pregnancy may very well be the private interest of an individual, but it has nothing

whatsoever to do with the Coverage Exclusion, which is aimed at protecting, not preventing, life.

The Majority then criticizes the Commonwealth for not establishing why it must "ensure that every pregnancy is carried to term" given that, according to the Majority, the real interest asserted by the Commonwealth is the "coercive use of women's bodies" to force women to "bear children against their will." (Majority Op. at 24) (citation omitted). First, where is that requirement anywhere in Pennsylvania law, let alone in the Coverage Exclusion? Abortions are legal in Pennsylvania and may be sought freely by any woman any number of times for any reason, subject to the limited (and valid for now) restrictions in the ACA.[10] The Commonwealth has never stated, argued, or enacted a policy ensuring that all pregnancies are carried to term. What is more, the suggestion that the Coverage Exclusion coerces a woman's use of her body by requiring her to make choices about where to spend her (and, maybe more importantly, Abortion Providers') money is untenable. Not a single aggrieved individual has come forward as a petitioning party alleging that she has been "coerced" into doing anything because she did not have access to Pennsylvania taxpayer dollars to pay for an abortion. To the extent that it is alleged to have occurred, it is one of many questions of fact that remain unresolved.

Next, the Majority analyzes the interest of "women's psychological well-being" and concludes, citing to *Osborne v. Ohio*, 495 U.S. 103, 109 (1990) (upholding under First Amendment attack an Ohio statute criminalizing the

---

[10] According to the Stipulations, approximately 35,000 abortions were performed in Pennsylvania in 2022 alone. (Stipulations, ¶ 30.)

possession of child pornography),[11] that the Commonwealth's interest in "protecting a competent adult from feeling regret for her free choices" is paternalistic and uncompelling. (Majority Op. at 25.)

The harms to women caused both by abortion and the unavailability of abortion remain hotly contested yet unadjudicated in this litigation. Abortion Providers and Respondents identify at length what they assert are the individual and collective harms caused when a woman cannot obtain funding for an abortion and is thereby "forced" to carry her pregnancy to term. *See, e.g.*, Stipulations, ¶¶ 30-55. The Commonwealth in response references, and presumably would present evidence establishing, the harms to women caused by abortion. *See, e.g.*, Commonwealth Br. at 19-20. The Majority sidesteps this dispute and determines that whatever psychological harms might be caused by having an abortion are a woman's problem, and the Commonwealth has no compelling interest in preventing them. The Majority also assumes, however, the reality of the alleged socio-political and financial harms caused when a woman purportedly is "coerced" by the Coverage Exclusion to forfeit her equal status in society, crucify her prerogative of self-determination, and accept motherhood as her primary function. Those *alleged* harms, which are the darlings of the Majority's analysis, are taken directly from the Stipulations[12] and tacitly accepted, of course without saying so. Once again, the Majority has neither identified the proper interest nor permitted the Commonwealth

---

[11] In *Osborne*, the United States Supreme Court held the statute at issue to be constitutional in part because it was not based on Ohio's "paternalistic interest in regulating Osborne's mind," but, rather, on Ohio's interest in protecting non-consenting minors from exploitation. 495 U.S. at 190.

[12] *See* Stipulations, ¶¶ 44-45.

PAM - 19

to prove with evidence that the *asserted* interest—the health and life of a mother—is compelling.

Lastly, the Majority turns to the asserted interest of respecting the consciences of Pennsylvania taxpayers who, for ethical, moral, and religious reasons, do not want to subsidize abortions with their own money. (Majority Op. at 25.) True to form, the Majority first renames the interest as one "favoring one group's conscience rights over another" and then declines to recognize it as compelling because the Commonwealth has not said why that is so.

First, the right to conscience (unlike the right to "reproductive autonomy") is expressly recognized in the Pennsylvania Constitution. *See* Pa. Const. art. I, § 3 ("[N]o human authority can, in any case whatever, control or interfere with the rights of conscience[.]"). It also has foundations in the organic law of this Commonwealth stronger than perhaps anywhere else in the Union, *see* Commonwealth Br. at 20, and has been expressly enacted in this context in Section 3202(d) of the ACA, 18 Pa.C.S. § 3202(d) ("[I]t is the public policy of the Commonwealth of Pennsylvania to respect and protect the right of conscience of all persons who refuse to . . . subsidize . . . abortions."). So, for the Majority to say that the Commonwealth has not "established" why the right to conscience is compelling is a *non sequitur*—the Constitution establishes it as such for the Commonwealth, its people, and this Court, and the Majority has no prerogative to ignore it.

Secondly, the Majority has not identified the *competing* conscience rights involved here. I do not understand Abortion Providers' and Respondents' fundamental argument to be that the Coverage Exclusion violates the conscience rights of Pennsylvania citizens because they cannot access, or contribute public money to fund, abortions. Pennsylvania citizens are entirely free to (and do)

contribute vast sums to privately subsidize abortions performed by Abortion Providers. Thus, I am at a loss to understand how any purported competing conscience rights of abortion funding supporters renders the General Assembly's careful policy choice in Section 3202(d) to be less than compelling.

Third, even assuming that policy choices concerning competing rights to conscience were at issue, the balance to be struck in that context (which is itself a compelling government interest) is to be made by the General Assembly and not this Court, and in no event without a hearing.

As to narrow tailoring, the Majority concludes via a single, citationless paragraph that the interests it has identified are not furthered by the Coverage Exclusion as the least intrusive means for doing so. The Majority first concludes that the interest in "promoting carrying a pregnancy to term" can be furthered by greater investment in maternal and infant healthcare and childcare, which make delivering and raising a child cheaper. (Majority Op. at 26.) The problem with the Majority's point, of course, is that Abortion Providers and Respondents are not arguing that expectant mothers on Medical Assistance have no choice but to seek an abortion because they cannot afford to deliver and raise a child. Although that might be an important consideration, it is not the one involved here in determining whether the Coverage Exclusion—a funding restriction on abortions, not childbirth—is narrowly tailored to serve the government interest of promoting unborn child life. With three narrow exceptions for rape, incest, and the preservation of a mother's life, the Coverage Exclusion is designed to restrict public funding of abortions sought for *any* reason, including for the very reasons courted by the Majority and Abortion Providers: self-determination, financial stability, equal participation in society, and avoiding "coerced" childbirths, none of which have anything to do with

the financial strain of raising a child. Thus, although increased taxpayer funding for maternal care and childcare might promote an interest in easing financial hardships that *could* lead to abortions, that interest is not implicated here.

As to women's health and life, the Majority concludes that, assuming abortions do inflict harm on women, the state can "license, regulate, and educate around such care." *Id.* Because there has been no hearing and no record made, I have no idea what additional licensing, regulation, and education would do to prevent any infliction of physical and mental harm on women who obtain abortions. Again, the Coverage Exclusion is aimed at favoring childbirth over *taxpayer-funded* abortions, in part because of the established public policy recognizing the harms that abortions can inflict on women.[13] I understand there is a dispute about that, but the Majority has skirted its resolution by granting summary relief.

Moreover, the Coverage Exclusion already is accompanied by an array of other provisions in the ACA that, at least for the time being, regulate abortion practice and licensing and require the pre-procedure education of women as to abortion's potential harms. *See, e.g.*, 18 Pa.C.S. § 3202(a) (expressing the intent of the General Assembly to "foster the development of standards of professional conduct in a critical area of medical practice"); § 3202(b)(1), (4), (5) (recognizing interests in establishing standards of care for providers and informed consent of women); § 3205(a)(1), (2) (requiring that a provider inform a patient of, among other things, the nature of the procedure, its risks and alternatives, the availability of printed literature on abortion and its alternatives, and the availability of medical

---

[13] For just one example, Amicus Curiae Eight Women Harmed by Abortions filed a brief identifying complex and long-lasting harms inflicted on women who obtain abortions. They also describe the impact that the availability of public funding for abortions has on abortion numbers and abortion harm. *See* Eight Women Harmed by Abortions Amicus Br., at 3-12.

PAM - 22

assistance benefits for prenatal care, childbirth, and neonatal care); § 3207(a) (authorizing the Department of Health to make rules and regulations regarding the performance of abortions and the facilities in which they are performed, including their procedures, staff, equipment, and laboratory testing requirements); § 18 Pa.C.S. 3208(a)-(c) (requiring the Department of Health to produce clearly-understandable printed materials in multiple languages designed to inform women of, among many other things, "objective information describing the methods of abortion procedures commonly employed, the medical risks commonly associated with each such procedure, the possible detrimental psychological effects of abortion and the medical risks commonly associated with each such procedure").

Despite the fact that these licensure, regulation, and education requirements already exist, the Majority contends that they are preferable to "taking an entire medical procedure off the table categorically for some women" who might benefit from it. (Majority Opinion at 26.) Again, and as I already have labored to emphasize, the Coverage Exclusion does nothing of the sort, and to the extent that Abortion Providers suggest that it does, they have not *proven* that fact in this Court.

Lastly, the Majority concludes, in a single sentence, that the Commonwealth has not established that the Coverage Exclusion is narrowly tailored to further the interest of "favoring one policy or conscience view over another regarding abortion," chiefly because alternatives such as a "tax choice" or "tax credit" program would be less intrusive. As to the Majority's proposed alternatives, I am unaware of the substance or contours of such tax programs, and there is no evidence in the record indicating how effective they would be in protecting the asserted right of every taxpayer in the Commonwealth to not subsidize abortions with their tax dollars.

In sum, then, as to Abortion Providers' ERA claim, the General Assembly first, and now the Commonwealth, has identified state interests in preserving the lives of unborn children, supporting and protecting women's lives and health from harms caused *both* by abortion and by childbirth, and preserving and protecting the consciences of Pennsylvania taxpayers who do not want to subsidize abortions with their tax dollars. When addressed head-on as they are identified, those interests are facially compelling and have expressly been identified as such by the General Assembly, by our Constitution, or both. The Majority neither deals squarely with these interests nor permits the Commonwealth to make its case establishing, with evidence, why the Coverage Exclusion is a narrowly-tailored means of *balancing* and furthering those interests.

This last point is critical. For purposes of applying strict scrutiny to the Coverage Exclusion, we ought not consider each interest discretely or in a vacuum. In enacting the ACA, the Coverage Exclusion particularly, the General Assembly carefully balanced all three interests, based on the evidence presented to it, so that *all three* would be furthered in proportion to their weightiness. To the extent that the Majority correctly identifies any of these interests, it analyzes them in simplistic fashion as if they were standalone policies. As they relate to the Coverage Exclusion, they are not.

In the end, I would deny summary relief on this claim, permit the Commonwealth an opportunity to present its case, and decide the issues on the merits with a fully developed record.

## B. Equal Protection

As a preliminary matter, given its disposition of Count I, the Majority, acting judiciously, should not have reached the merits of Count II. The Majority

PAM - 24

acknowledges the principle that, where a single issue is sufficient to dispose of a matter, a court ought not resolve other issues that are unnecessary to the disposition. *See* Majority Op. at 28 n. 15 (citing *Commonwealth v. Dunkins*, 263 A.3d 247, 253 (Pa. 2021)). That principle applies with double force where, as here, disposing of a second, nonessential claim requires the recognition of a new constitutional right. *See, e.g.*, *In re: Fiori*, 673 A.2d 905, 909 (Pa. 1996) (in a case concerning the removal of life-sustaining medical treatment, the Court declined to find constitutional bases for the right of "self-determination" where common-law rights were sufficient). Nevertheless, the Majority concludes that the "unique procedural posture" of this case warrants consideration of whether the Pennsylvania Constitution contains a right to "reproductive autonomy" that is impermissibly burdened by the Coverage Exclusion. (Majority Op. at 28 n.15.) More specifically, the Majority interprets the Pennsylvania Supreme Court's mandate in *AR III* to require consideration of this claim on remand. *Id.* It does not. Although the Pennsylvania Supreme Court set forth the analytical framework that now must apply to such claims, *AR III*, 309 A.3d at 947, it did not compel disposition of the equal protection claim on remand. *Id.* Because it is unnecessary and, like Count I, is being decided without evidence, a record, or factfinding, the Majority should not have reached it.

Having reached it, though, the Majority errs in its disposition. In *AR III*, the Pennsylvania Supreme Court overruled *Fischer*'s interpretation of article I, section 26 of the Pennsylvania Constitution and concluded that it affords greater protections than its federal counterpart. 309 A.3d at 945. The Court then adopted an analytical framework that "adheres to principles of neutrality," requiring that, "when a court is presented with a legislative classification that touches on the

PAM - 25

exercise of a civil right and it is being challenged on the basis that it is discriminatory, the court shall determine whether the classification operates neutrally with regard to the exercise of that right. If it does not, the court shall then conduct a commensurate means-end review." *Id.* The Court explained that to "discriminate" under article I, section 26 means to lack neutrality, which the government must adequately justify. *Id.* The Court determined that the Coverage Exclusion creates a classification by differentiating between pregnant women receiving Medical Assistance who would seek abortions and those who pursue childbirth. Based on the individuals' choices, the former would not receive public funding for the abortion, but the latter would receive public funding for prenatal and postnatal care. *Id.*

The Majority begins, not with the text of article I, section 1 of the Pennsylvania Constitution, but by finding a right to "reproductive autonomy" and a "right to reproductive decision-making" presumably in article I, section 1, article I, section 28, and elsewhere where the equality of the sexes is "enshrined." (Majority Op. at 32-34). This right includes the "right to self-determination," the right to "make important reproductive healthcare decisions," a "gender-neutral right to make decisions without government intrusion [except payment] into those private matters that play a defining role in the course of a lifetime," and a right "to be left alone [except payment] to pursue happiness and enjoy liberty." *Id.* at 34. The Majority then concludes that recognizing this fundamental right is necessary to "restrict the government to its proper sphere [except funding], thus protecting our liberty" and imposing strict judicial scrutiny upon the government's "attempts to coerce reproductive choice," which choices "are the People's, not the government's [except funding]." (Majority Op. at 34.) Having recognized a fundamental constitutional

right, the Majority conducts a strict scrutiny analysis and concludes, for the same reasons as under Count I, that the Coverage Exclusion fails. (Majority Op. at 36-37.)

It is impossible to conduct a careful analysis of language that clearly has spun, in various forms, from social policy objectives and not from any text of the Pennsylvania Constitution that I can find. The Majority simply concludes that this right, whatever it is, exists because the Majority says it does. I cannot agree with that conclusion, even were I to peek with the Majority into the various "penumbras, formed by emanations," of various clauses of the Pennsylvania Constitution. *See Griswold v. Connecticut*, 381 U.S. 479, 484 (1965). Although addressing *Roe v. Wade*, 410 U.S. 179 (1973), the United States Supreme Court's analysis in *Dobbs* has now proved prophetic in this Court's constitutional jurisprudence:

> For the first [152] years after the adoption of [article I, section 1], [the General Assembly] was permitted to address [public funding for abortion] in accordance with the views of its citizens. Then, in [2026], this Court [issued the Majority Opinion]. Even though the Constitution makes no mention of abortion, the Court held that it confers a [fundamental] right to obtain one [as an exercise of "reproductive autonomy"]. It did not claim that [Pennsylvania] law or the common law had ever recognized such a right, and its [analysis] ranged from the constitutionally irrelevant . . . to the plainly incorrect . . . . After cataloging a wealth of other information having no bearing on the meaning of the Constitution, the opinion concluded with a [collection of rights] much like those that might be found in a statute enacted by a legislature.

597 U.S. at 225-27.

I am not convinced that a right to reproductive autonomy or anything like it exists in the Pennsylvania Constitution to afford anyone a *constitutional* right to obtain an abortion. I accordingly would conclude that there is no constitutional right, let alone a fundamental one, "touched" by the Coverage Exclusion's distinction between women on Medical Assistance who seek abortions and those who do not. In Pennsylvania, there is only a statutory right to obtain an abortion, and as a result, rational basis review applies to the Coverage Exclusion. That requires us to determine whether the distinction made in the Coverage Exclusion between the women who receive taxpayer funding and those who do not is rationally related to a legitimate state interest.

As noted by Justice Mundy in her concurring and dissenting opinion in *AR III*, to ask such a question is to answer it. 309 A.3d at 1004 (Mundy, J., concurring and dissenting). Women receiving Medical Assistance who seek an abortion are not similarly situated to those who seek to give birth, and each group either furthers or inhibits the Commonwealth's interest in favoring the protection of unborn children. That interest undoubtedly is at least "legitimate," particularly where, as here, the question involves the allocation of limited taxpayer funds. Because the Coverage Exclusion's restriction on taxpayer funding certainly is rationally related to the Commonwealth's interest in favoring unborn child life, it survives judicial scrutiny and is valid under article I, section 26 of the Pennsylvania Constitution. *Id.*[14]

_____

[14] Notwithstanding, even if strict scrutiny were to apply, for the reasons I have already stated under Abortion Providers' ERA claim, I would conclude first that a hearing and factfinding is necessary to determine whether the interests asserted by the Commonwealth are compelling and whether the Coverage Exclusion is narrowly tailored to further those interests. As with Count I, the Majority similarly deprives the Commonwealth of the opportunity to make its case on Count II, which is plainly erroneous.

The Majority concludes to the contrary, noting that even if rational basis review applied, the Coverage Exclusion is not rationally related to the three stated Commonwealth interests of protecting unborn child life, protecting maternal health, and protecting the right of conscience of Pennsylvania taxpayers. Specifically, as to the protection of unborn child life, the Majority concludes that, because the Coverage Exclusion does not contain an exception for unborn children that will not survive childbirth, it is not rationally related to an interest in preserving "potential life." "Rather, it must be pursuing some other interest, or no coherent interest at all." (Majority Op. at 38.) The Majority here erroneously applies strict scrutiny, concluding that the Coverage Exclusion is not narrowly tailored because of the exceptions it does not make. But, even assuming that the Coverage Exclusion could prevent, or has ever once prevented, a mother from aborting a child she knows will not survive childbirth, that does not change the fact that the Coverage Exclusion's restrictions on public funding for *all abortions* is rationally related to its objective: to preserve unborn child life. The Majority's analysis also is based on an entirely unjustified and, frankly, insulting assumption: that an unborn child's life, the vitality of which will end prior to or during childbirth, has no present value worthy of being protected by the Coverage Exclusion. Many aggrieved Pennsylvania parents who have simultaneously planned births and funerals for their unborn children would disagree.

Second, as to women's health, the Majority concludes that, even assuming the Commonwealth could prove with evidence that abortion causes harm to women, Abortion Providers have asserted in the Stipulations that carrying pregnancies to term has caused medical harm to women, including those who have been "coerced" into carrying their pregnancies to term by the Coverage Exclusion.

PAM - 29

(Majority Op. at 38-39.) First, and again, the Commonwealth did not join, and is not precluded from making its case because of, the Stipulations, which in any event do not bind this Court for purposes of summary relief. Second, and again, neither the Stipulations nor anything else in the filings before us have *established* that the Coverage Exclusion has ever coerced anyone into doing anything, let alone forced a woman to carry to term a pregnancy from which she suffered medical harms. Third, the Majority agrees with Abortion Providers that it is "irrational" to exclude public funding for abortions without exceptions for unborn children with severe or fatal abnormalities to further a government interest in "encouraging those people to stay pregnant against their will." (Majority Op. at 39) (citing Abortion Providers' Br. at 46). This, once again, is strict scrutiny "narrow tailoring" analysis utilizing a straw man government interest and what is likely (although we do not know because we have no facts) a *de minimis* number of exceptional cases.

Third, in discussing the right of conscience, the Majority claims to not really know what "conscience" means in this context, but nevertheless construes it as religious belief, the favoring of which "seems like" a violation of the federal Establishment Clause.[15] (Majority Op. at 39.) The Majority then posits that, if the interest involved is a "content-neutral" interest in protecting the "conscience rights of all similarly situated taxpayers who oppose government use of their tax payments for objectionable things," the Coverage Exclusion is irrationally narrow. *Id.* (emphasis removed).

Preliminarily, the Establishment Clause has not been asserted in this case and is irrelevant to our analysis. As to the actual conscience interest involved here, it is not a generic interest in protecting taxpayers from funding anything they

---

[15] U.S. Const. amend. I (stating, in pertinent part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof").

PAM - 30

find "objectionable." Rather, it is a recognized interest in protecting the longstanding moral and ethical objections that many people, as expressed by the General Assembly in the ACA, lodge generally to the termination of an unborn child's life and particularly to the funding of it with their own money. The Coverage Exclusion precisely furthers that interest and is rationally related to it, notwithstanding that it does not (1) allocate funding for abortions that would further certain factually undefined and unestablished interests in maternal "health" or (2) deal with fetus nonviability. (Majority Op. at 39.) Pursuant to current Pennsylvania law, women are free to seek abortions in those contexts and pay for them with their own or Abortion Providers' money.

Moreover, and more fundamentally, if the General Assembly did not have the power to choose certain moral and ethical interests to favor or emphasize over others, especially as regards public funding, it could not legislate at all. That is of the essence of both the police and purse powers, which the People, by their Constitution, have granted to the General Assembly, not this Court. *See* Pa. Const. art, I, § 2; art. II, § 1; art. III, § 24; *Robinson Township, Washington County v. Commonwealth*, 83 A.3d 901, 946 (Pa. 2013).[16]

---

[16] The Concurring Opinion discovers in Pennsylvania a "clear and unbroken line of the foundational legal documents establishing a fundamental right to personal freedom, equality, and tolerance" that "compels" the provision of taxpayer-funded abortion-on-demand. (Concurring Opinion, at 2.) The Concurring Opinion tethers this line to a scholastic history of the Quaker faith, to selected provisions of William Penn's *Charter of Privileges*, and to Penn's writings on the necessity of the "right of conscience" to the preservation of undefiled Christian worship of Almighty God, as understood and dictated by the authoritative Scriptures. *Id.* at 3-13. The Concurring Opinion then turns to an analysis of prior versions of the Pennsylvania Constitution, noting that those charters, like our current one, protected the right of any person to worship "Almighty God" according to the dictates of his own conscience. *Id.* at 13-18.

Although the Concurring Opinion does not thereafter discuss "equal protection," "reproductive autonomy," "compelling interests," or "narrow tailoring," it nevertheless concludes
**(Footnote continued on next page…)**

that the right, liberty, or freedom of conscience, however one might prefer to term it, "precludes the Commonwealth from constitutionally coercing a competent woman by statute to prevent her from receiving required medical care to end her pregnancy." *Id.* at 19. It opines elsewhere that, "[a]s it relates to the exercise of a woman's right to choose," "this inherent right to act according to one's own conscience, or sincerely held system of beliefs, in the pursuit of happiness" prohibits the Commonwealth from "bending the moral will of a competent woman" by not publicly funding unrestricted access to abortion-on-demand. *Id.* at 25-26. The Concurring Opinion both insists that this "construction of William Penn's intent" for Pennsylvania is evidenced by modern Quaker statements on sexuality and abortion and agonizes that the ACA discourages or precludes a "Quaker patient" from obtaining taxpayer-funded abortions that conform to her "faith." *Id.* at 19-23, 26.

I do not understand Abortion Providers to be arguing either that taxpayer-funded abortion-on-demand is religious worship or that we ought to interpret the Pennsylvania Constitution consistently with public statements from modern religious meetings, but I cannot make sense of the Concurring Opinion's comments other than as suggesting such things. As far as they go, however, the Concurring Opinion's carefully sieved provisions of the *Charter of Privileges* and former and current Pennsylvania constitutions clearly establish that any right of conscience, particularly as understood by William Penn, was inextricably tied to what Penn and the Quakers deemed to be faithful Christian worship and practice. Indeed, Penn's First Frame of Government, which is omitted from the Concurring Opinion, begins with Penn's recognition of God's absolute rule as the basis for all government. For authority, Penn cites at length to the Epistles of the Apostle Paul, namely, Galatians 3:19, 1 Timothy 1:9, and Romans 13:1-5. *See Preface, Frame of Government of Pennsylvania* (May 5, 1682), *available at* https://avalon.law.yale.edu/17th_century/pa04.asp#1 (last visited April 20, 2026). The Concurring Opinion ironically characterizes Penn's attitudes in this regard as being in "stark contrast" to the other "theocentric" (tr., "God-centered") colonies in early America. (Concurring Opinion, at 23.) Here, it seems to me, the Concurring Opinion's "clear and unbroken line" snaps before ever shoving off from Sussex.

Last, I agree lockstep with the Concurring Opinion that this lady doth indeed protest. But not too much, and not by way of any hyperbolic "gratuitous attack." My protestations that the Majority and Concurring Opinions have recognized rights and performed legal analysis untied to any clear constitutional or historical texts are neither extreme nor personal. They are sober. In my view, I have rightly and tightly pressed my colleagues to read the texts involved here, as one would responsibly read Shakespeare, according to the meanings intended by their drafters. They simply cannot "change meaning from age to age to comport with [ ] whatever the zeitgeist," today divined by four judges of this Court, "thinks appropriate." *See* Justice Antonin Scalia, Reading Law, Princeton University (December 10, 2012), *available at* https://www.princeton.edu/news/2012/12/11/scalia-favors-enduring-not-living-constitution (last visited April 20, 2026).

### III.    Conclusion

On remand, this Court was responsible for properly *hearing* and deciding Abortion Providers' claims in our original jurisdiction, which necessarily required our affording the Commonwealth an opportunity to make its *case*, not just file a brief. I do not believe we have fulfilled that responsibility, in no small part because of the magnitude of the issues presented here.

Worse still, the Majority decides an unnecessary constitutional question by creating a new fundamental right that has no definition, no contours, no practical applicability, and no textual support in the Pennsylvania Constitution. If the People desire such a right, they freely may amend their constitution.[17] This Court may not.

I would deny summary relief, schedule a hearing, and decide Abortion Providers' claims with the development of a factual record and factfinding. Even without a hearing and on the record as it currently stands, I still would conclude that the Coverage Exclusion does not violate the Pennsylvania Constitution because it furthers compelling state interests and is narrowly tailored to suit that purpose.

I dissent.

_____
PATRICIA A. McCULLOUGH, Judge

Judge Covey and Judge Wallace join in this Dissenting Opinion.

---

[17] Article I, section 2 of the Pennsylvania Constitution provides:

> All power is inherent in the people, and all free governments are founded on their authority and instituted for their peace, safety and happiness. For the advancement of these ends they have at all times an inalienable and indefeasible right to alter, reform or abolish their government in such manner as they may think proper.

Pa. Const. art. I, § 2.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Allegheny Reproductive Health Center, :
Allentown Women's Center, Delaware :
County Women's Center, Philadelphia :
Women's Center, Planned Parenthood :
Keystone, Planned Parenthood :
Southeastern Pennsylvania, and Planned :
Parenthood of Western Pennsylvania, :
                     Petitioners :
                               :
         v. : No. 26 M.D. 2019
                               : Argued: November 5, 2025
Pennsylvania Department of Human :
Services, Teresa Miller, in her official :
capacity as Secretary of the :
Pennsylvania Department of Human :
Services, Leesa Allen, in her official :
capacity as Executive Deputy Secretary :
for the Pennsylvania Department of :
Human Service's Office of Medical :
Assistance Programs, and Sally Kozak, :
in her official capacity as Deputy :
Secretary for the Pennsylvania :
Department of Human Service's Office :
of Medical Assistance Programs, :
                     Respondents :

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
              HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE ANNE E. COVEY, Judge
              HONORABLE MICHAEL H. WOJCIK, Judge
              HONORABLE LORI A. DUMAS, Judge
              HONORABLE STACY WALLACE, Judge
              HONORABLE MATTHEW S. WOLF, Judge

DISSENTING OPINION
BY JUDGE WALLACE                                        FILED:  April 20, 2026

As we celebrate 250 years of our country's existence and as we contemplate the achievements of the 67 counties forming our great Commonwealth, I have been reflecting on why Pennsylvania is called the Keystone State.  The name is derived from being central to the original 13 colonies.  A keystone is "the wedge-shaped piece at the crown of an arch that locks the other pieces in place."  *Keystone*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/keystone (last visited 4/17/2026). The keystone applies pressure on the surrounding stones which force them together to lock the arch and allow it to support weight. Without it, the arch would collapse.  By way of contrast, we have three co-equal branches of government so not any one branch is the keystone.  Equally true, however, is that without any one of the branches, the constitutional republic we enjoy would surely collapse.  As early as 6th grade I learned (and hope children are still learning) about the importance of governmental checks and balances and the separation of powers. This case represents a classic example of when the judicial branch needs to know the limits of its power – to know to stay in its lane.  We should be driving in the lane of applying the law, not making policy, which is the lane rightly traversed by the legislative branch.  Those in the legislative branch, after all, were elected by the people to set policies reflecting the people's voices.  Therefore, I approached this case like I would any other summary relief application, keeping in mind that a grant of summary relief disposes of a case before a party even gets its day in court.  For reasons that follow, I dissent.[1]

---

[1] To that end, my only response to Judge Wojcik's concurring opinion, *Allegheny Reproductive Health Center. v. Pennsylvania Department of Human Services* (Pa. Cmwlth. No. 26 M.D. 2019, **(Footnote continued on next page…)**

Regarding Count I, the Majority concludes the Commonwealth has failed to rebut the presumed unconstitutionality of the Coverage Exclusion by showing it is the least intrusive means of pursuing compelling state interests. Because I believe genuine issues of material fact prevent us from granting summary relief, at this juncture, I would deny summary relief. Further, as to Count II, given the Majority's holding that the Coverage Exclusion violates the Equal Rights Amendment, I would not reach Providers' challenge based on equal protection under article I, section 26 of the Pennsylvania Constitution.

Under Pennsylvania Rule of Appellate Procedure 1532(b), a party is permitted to file an application for summary relief at any time after a petition for review has been filed in this Court's original jurisdiction. *C.M. v. Pa. State Police*, 315 A.3d 908, 911 (Pa. Cmwlth. 2024). We view the evidence in the light most favorable to the non-moving party and grant summary relief only if there is no genuine issue as to any material fact and the right to relief is clear as a matter of law. *Hosp. & Healthsystem Ass'n of Pa. v. Com.*, 77 A.3d 587, 602 (Pa. 2013). "The moving party has the burden of proving the nonexistence of any genuine issue of fact." *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 468-69 (Pa. 1979). "A material fact is one that directly affects the outcome of the case." *Dep't of Env't Prot. v. Delta Chems., Inc.*, 721 A.2d 411, 416 (Pa. Cmwlth. 1998) (en banc). "The facts which directly affect the outcome of the case are gleaned from considering the substantive law underlying the cause of action." *Id.* (citation omitted). All doubts as to the existence of a genuine issue of a material fact are to be resolved against the granting of

---

filed April 20, 2026) (Wojcik, J., concurring), is that while my learned colleague's writing is interesting, I am trying mightily to stay focused on the legal considerations before us and that is simply whether Providers have established all facts necessary to prevail without a hearing.

summary judgment. *Shoats v. Comm'r, Pa. Dep't of Corr.*, 591 A.2d 326, 330 (Pa. Cmwlth. 1991) (citing *Penn Center House, Inc. v. Hoffman*, 553 A.2d 900 (Pa. 1989)).

> In its Mandate to this Court, the Pennsylvania Supreme Court held that
>
> when a statute, such as the Coverage Exclusion, is challenged as violative of Section 28, a sex-based distinction is presumptively unconstitutional, and it is the government's burden **to rebut the presumption with evidence** of a compelling state interest in creating the classification and that no less intrusive methods are available to support the expressed policy.

*Allegheny Reprod. Health Ctr. v. Pa. Dep't of Hum. Servs.*, 309 A.3d 808, 947 (Pa. 2024) (*Allegheny Reproductive II*) (citations omitted and emphasis added). As such, this Court must address whether the Commonwealth can meet its burden to rebut the presumption of unconstitutionality of the Coverage Exclusion "with evidence of a compelling state interest" and that "no less intrusive means are available to support the expressed policy." *Id*. The Attorney General identifies three state interests he asserts are compelling on behalf of the Commonwealth: protecting fetal human life, preserving the health of the mother, and safeguarding the conscience rights of Pennsylvania citizens. Attorney General's Br. at 8.

Without providing the Attorney General the opportunity **to present evidence** to this Court regarding these asserted interests, the Majority simply dismisses them, noting: "[W]e are not persuaded that the state interests the Attorney General has identified are compelling within the Equal Rights Amendment analysis." *Allegheny Reprod. Health Ctr. v. Pa. Dep't of Hum. Servs.* (Pa. Cmwlth. No. 26 M.D. 2019, filed April 20, 2026), slip op. at 24 (Majority Op.). Regarding the Commonwealth's first asserted interest, its interest in protecting fetal human life, without a record or evidence to rely upon, the Majority concludes the Attorney General "has not shown

or argued why, as a matter of law, the state must ensure that every pregnancy is carried to term." *Id.* On this point, the Majority cites to Justice Wecht's concurring opinion asserting "the interest 'can be understood only as an interest that is advanced at the cost of forcing women to bear children against their will. It will be DHS's unenviable burden on remand to establish that a state interest that is advanced through the coercive use of women's bodies is constitutionally compelling.'" *Id.* (quoting *Allegheny Reproductive II*, 309 A.3d at 955 (Wecht, J., concurring)). The Majority goes on to state the Attorney General "has not explained why *that interest* is compelling for the state." *Id*. (emphasis in original). I cannot agree with the Majority's reframing of the Commonwealth's interest in this way or its resultant distorted conclusion that the Commonwealth failed to meet its burden. I believe the Attorney General should be afforded the opportunity **to present evidence** of the Commonwealth's interest in the preservation of fetal life.

Regarding the Commonwealth's second asserted interest, preserving the health of the mother, the Majority addresses only a woman's psychological well-being and asserts the Attorney General "has not identified any other context in which we have found a compelling state interest in protecting a competent adult from feeling regret for her free choices." Majority Op. at 25. However, the Attorney General asserts the Commonwealth's interest in the mother's health extends to alleged "harmful psychological, emotional, and physical impacts of abortion." Attorney General's Br. at 19. Certainly, the impact of abortion to women's overall health is material to whether the Commonwealth has a compelling interest. The parties dispute the health impacts of pregnancies versus abortions to women's

health[2] and, accordingly, the Attorney General should have an opportunity **to present evidence** to support its burden.

Regarding the Commonwealth's third asserted interest, safeguarding the conscience rights of Pennsylvania citizens, the Majority concludes that "[j]ust because the legislature *has in fact* expressed a policy preference for favoring one group's conscience rights over another's, that does not mean it has a *compelling* interest in doing so." Majority Op. at 25. Yet, again, the Majority denies the Attorney General the opportunity **to present evidence** regarding the Commonwealth's asserted interest in safeguarding the conscience rights of Pennsylvania citizens.

The Commonwealth's asserted interests in protecting fetal life, preserving the health of the mother, and safeguarding the conscience rights of Pennsylvania citizens and whether those interests are compelling raise genuine issues of material fact. While factual stipulations exist in the record from the parties' Joint Statement,[3] those

---

[2] In the Joint Statement of Undisputed Facts (Joint Statement), Providers and DHS stipulate that "[p]regnancy can have serious effects on a woman's physical and mental health, some of which can result in permanent disability or even lead to life-threatening conditions." Joint Statement, at 17. The Joint Statement goes on to outline the harms of pregnancy to women. However, while the Joint Statement mentions that there are risks associated with abortions, it does not provide facts regarding those risks.

[3] Notably, "[a] stipulation is a declaration that the fact agreed upon is proven [, and a] valid stipulation must be enforced according to its terms." *Com. v. Mitchell*, 902 A.2d 430, 460 (Pa. 2006) (quotation omitted). While parties have ample leeway regarding their entry into stipulations, that ability is not unlimited. *Com. v. Perrin*, 291 A.3d 337 (Pa. 2023). Parties "cannot stipulate to matters affecting the jurisdiction, business, or convenience of the courts." *Id*. at 345 (citation omitted). Because these areas are "inherently and traditionally the prerogative of the judiciary," they are not subject to stipulation by the parties. *Id*. (citation omitted). Moreover, only **facts** are amenable to stipulation. *Id*. at 344-45. Additionally, "it is well established that matters affecting the public interest cannot be made the subject of stipulations so as to control the court's action with respect thereto." *Id*. at 345 (quoting *State v. Tangalin*, 657 P.2d 1025 (Haw. 1995)). While valid
**(Footnote continued on next page…)**

stipulations do not resolve the Commonwealth's asserted interests. Further, the parties dispute the material facts regarding the Commonwealth's asserted interests, such as the impact of abortion to women's health. Issues of this magnitude and public consequence demand careful and restrained application of the law, and we must keep in mind that "[a] ruling of unconstitutionality *frustrates* the intent of the elected representatives of the people." *Caba v. Weaknecht*, 64 A.3d 39, 50 (Pa. Cmwlth. 2013) (citing *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008)). As the Supreme Court discerned regarding important matters of public interest:

> Our task is different from that of the litigant, the politician, or the editorialist, and it is inevitably less understood and often less popular. Our sworn task is to apply the law; and in so doing we cannot ignore, rewrite or torture settled language and propositions, and then apply that construct retroactively without affording the parties an opportunity to be heard, in order to reach a perceived favored conclusion, no matter how extreme the circumstance that brings a dispute to our attention.

*In re Interbranch Comm'n on Juv. Just.*, 988 A.2d 1269, 1283 (Pa. 2010). Because by granting summary relief, the Attorney General is denied an opportunity **to present evidence** of the Commonwealth's asserted interests, Providers' right to relief is not clear as a matter of law.

Before we can apply the legal framework set forth by the Supreme Court in *Allegheny Reproductive II* to determine whether the Coverage Exclusion violates the Equal Rights Amendment, we must have a clear view of the relevant facts, including

---

stipulations are binding and conclusive on the Court, the Court nonetheless draws its own legal conclusions from those facts. *Mader v. Duquesne Light Co.*, 241 A.3d 600, 615 (Pa. 2020). Accordingly, insofar as DHS and Providers stipulated to legal conclusions in the Joint Statement, the Court is not bound by those asserted stipulations.

facts regarding the Commonwealth's asserted interests.  Accordingly, as to the Equal Rights Amendment analysis, I would conclude that genuine issues of material fact prevent this Court from granting summary relief.[4]

Further, because the Majority's conclusion that the Coverage Exclusion violates the Equal Rights Amendment is dispositive, it is undoubtedly unnecessary for the Court to address Providers' challenge based on equal protection under article I, section 26 of the Pennsylvania Constitution.  The Majority holds there is a fundamental right to reproductive autonomy, and the Coverage Exclusion violates equal protection.  Majority Op. at 37.  I believe the gravity of this constitutional issue imperatively commands the exercise of judicial restraint, and I would refrain from needlessly deciding this issue. Restraint is not just my belief; it is our duty.

"If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 113 (1993) (citing *Spector Motor Serv., Inc. v. McLaughlin,* 323 U.S. 101, 105 (1944)).  It is a "sound tenet of jurisprudence that courts should avoid constitutional issues when the issue at hand may be decided upon other grounds."  *Com. v. Herman*, 161 A.3d 194, 209 (Pa. 2017) (citations omitted).  Here, in addressing Providers' equal protection challenge to the Coverage Exclusion, the Majority concludes that "[a]rticle I of the Pennsylvania Constitution guarantees a fundamental right to reproductive autonomy" and "the Coverage Exclusion does not operate neutrally with respect to that right and is not properly justified in doing so, and accordingly the Coverage Exclusion violates the equal

---

[4] To be clear, although I would conclude the Commonwealth is entitled to proceed at this stage, that conclusion does not indicate one way or the other whether the Commonwealth would ultimately prevail.

protection guarantee in [a]rticle I, [s]ection 26 of the Pennsylvania Constitution." Majority Op. at 38. Thus, the Majority not only unnecessarily reaches a constitutional issue, but does so in a manner that recognizes a fundamental right to "reproductive autonomy" without clearly defining what that right entails and without the benefit of a developed record.

As the United States Supreme Court observed in *Whitehouse v. Illinois Central Railroad Company*: "These are perplexing questions. Their difficulty admonishes us to observe the wise limitations on our function and to confine ourselves to deciding only what is necessary to the disposition of the immediate case." 349 U.S. 366, 372-73 (1955). Accordingly, I disagree with the Majority's decision to unnecessarily address, simply because it wants to, the issue of whether the Coverage Exclusion violates equal protection given that it already holds the Coverage Exclusion unconstitutional under the Equal Rights Amendment.

Reflecting on the **limits to our power** and that the legislative body holds the power to make policy decisions, it does not escape me that in a post *Dobbs* era, *see Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), our legislative branch has not restricted or ended abortion access in our Commonwealth. Nonetheless, the judicial branch in a power grab is effectuating policy by determining that a state constitutional right to abortion exists. By determining that the right to abortion (or more broadly, "reproductive autonomy,") is constitutionally, not statutorily derived, the judicial branch is very intentionally stripping the legislative branch of its rightful power, which in effect is robbing the people who elect the legislators of their voices. That being said, historically, at times, when the judicial branch has veered without caution into the other lane, we have triggered

legislative response. At times, our reckless driving has created unintended consequences.

By determining the right to reproductive autonomy is enshrined in the state constitution, we strip the legislative branch from establishing policy which reflects the evolving and ever-changing voice of the Commonwealth's people.[5]

For the above reasons, I dissent.

_____
STACY WALLACE, Judge

Judge McCullough joins in this Dissenting Opinion.

---

[5] The Majority challenges my concern of honoring the will of the people's voice which may be "evolving and ever-changing," because the Majority posits that "[c]onstitutional rights are fixed." Majority Op. at 35. While I wholeheartedly agree that constitutional rights are fixed and cannot be changed at the whim of the people, my point is the ink has not even dried on this drafted majority opinion yet. Only upon docketing of this Opinion will this constitutional right come to be recognized. At the time I am writing this, the Abortion Control Act remains unchallenged, except for the portion dealing with taxpayer funded abortions. Certainly, should the legislative branch try to eliminate or further restrict abortion access in Pennsylvania, then a cause of action may properly be brought to challenge whether our state constitution includes a right to reproductive autonomy, but that question should not be reached today. The Majority also maintains that we "must" reach these two constitutional questions. The Majority provides that "we have clear and detailed instructions on remand to address two constitutional questions." *Id*. However, I do not read the Supreme Court's Mandate as dictating that we must reach the second issue. If the Majority can point to where *a majority* of the Supreme Court told us that we must address both constitutional questions, I will withdraw my claim of activism regarding reaching the issue of reproductive autonomy.

SW - 10